In re: **TELXON CORPORATION SECURITIES LITIGATION**

No. 5:98–CV–2876.

United States District Court, N.D. Ohio, Eastern Division.

Sept. 29, 2000.

Arthur M. Kaufman, Hahn, Loeser & Parks, Cleveland, OH, Susan Salvetti, Zwerling, Schachter & Zwerling, New York, NY, for Dorothy D Bragdon, plaintiff.

Steven J. Miller, Drew A. Carson, Goodman, Weiss, Miller, Cleveland, OH, for Telxon Corp., defendant.

William B. Steele, III, Bradley W. Foster, David L. Peavler, Locke, Liddell & Sapp, Austin, TX, for Frank E Brick, defendant.

### *MEMORANDUM & ORDER*

O'MALLEY, District Judge.

After being appointed Lead Plaintiffs, William Hayman and Arthur Hayman filed their Complaint against Telxon Corporation on September 30, 1999 for alleged violations of § 10(b) and § 20(a) of the Securities and Exchange Act of 1934. Telxon responded with a Motion to Dismiss (docket no. 15), contending that plaintiffs have failed to state with sufficient particularity a claim for securities fraud under Rule 9(b) of the Federal Rules of Civil Procedure and the heightened pleading requirements of the Private Securities Litigation Reform Act ["PSLRA"], 15 U.S.C. § 78u–4(b)(1) & (2). The Motion to Dismiss is now fully briefed and ready to be ruled upon. For the reasons stated

below, Telxon's Motion to Dismiss is **DE-NIED.**

## I. Background

Telxon designs and manufactures wireless and mobile information systems, distributing products and providing services in more than sixty (60) countries. Telxon is a Delaware corporation with its principal place of business in Ohio. Frank E. Brick was the Chairman and Chief Executive Officer of Telxon. Brick served as Chief Executive Officer from February of 1997 to March of 1999, when he was terminated. Kenneth Haver was Telxon's Chief Financial Officer and Senior Vice President of Finance and Administration. Haver served in these positions beginning in March of 1995; he was also terminated in March of 1999. Brick and Haver signed disclosure statements to the Securities and Exchange Commission ["SEC"] which plaintiffs contend were fraudulently manipulated to make it appear that Telxon was a growing and profitable corporation when, in fact, it was not. They also made public statements, either disclosing Telxon's financial results or lauding Telxon's earning and profit-making capabilities, that plaintiffs allege were fraudulent.

Lead plaintiffs, William Hayman and Arthur Hayman, represent a class of shareholders of Telxon common stock who claim financial loss because the market price of Telxon common stock and other securities they purchased during the class period were artificially inflated as a result of alleged material misrepresentations and omissions in the financial disclosures with the SEC and in defendants public statements. The relevant class period is from May 21, 1996 to February 23, 1999.

This lawsuit springs from Telxon's re-statement of various prior financial disclosures, and the sharp decline in Telxon's stock prices resulting from those restatements. Telxon restated its prior financial disclosures several times, eventually significantly restating three years' worth of financial data. The complaint, for the most part, describes the differences between the financial data as originally disclosed, and as later restated, and the violations in Generally Accepted Accounting Principles ["GAAP"] and other accounting improprieties that allegedly account for those differences. Plaintiffs also assert that, given the egregious nature of the irregularities in Telxon's financial statements, Brick and Haver must have been aware of them, and ascribe motives to Brick and Haver which plaintiffs say explain the false disclosures.

On December 11, 1998, after nearly three years of "meeting or beating" the expectations of securities analysts about Telxon's continuing growth and profitability, Telxon restated its SEC financial disclosures for the fiscal year 1999 second quarter financial results. Telxon attributed this re-statement to the accounting treatment of a single transaction during that period. Telxon declared that it restated its disclosures:

> to reflect a change in the timing of recognizing revenues financed under a new floor-plan arrangement, to a segment of its Value Add Distributor (VAD) channel. The company announced that, based on advice from its outside auditors, PriceWaterhouseCoopers, LLP, revenues under this new financing program are more appropriately recognized upon the VADs resale to end-user customers.

*See* Def. Ex. 1. This restatement caused Telxon's stock price to fall from $27¼ to $15 per share on volume of over 5.6 million shares.

On February 23, 1999, Telxon announced that it would restate its SEC financial disclosures for the fiscal years and financial quarters beginning with March 31, 1996 through to the second fiscal quarter of fiscal year 1999. In its February 23, 1999 press release, Telxon characterized its restatement of the last three years' financial disclosures as occurring after a "review of certain judgmental accounting matters." In the press release, Telxon stated:

> The restatement of the prior audited periods results from the re-evaluation of

the accounting treatment of certain discrete transactions, not from the discovery of any irregularities or wrongdoing of the company. The majority of the aggregate restatement is attributable to asset impairments and valuation allowances, with the balance mostly attributable to adjustments of revenue previously recognized for certain transactions.

\* \* \* \* \* \*

Revenues for the quarter were negatively affected by the unanticipated cancellation of a $13 million order to a large logistics company in early December, 1998, by unanticipated delays in the role-out of two large retail projects totaling $18 million due to integration issues related to third-party hardware and software, and by lower than expected demand.

See Def. Ex. 2. This additional restatement caused Telxon's stock price to fall to a low of $5¾ per share in March of 1999.

On June 16, 1999, Telxon announced that yet a further restatement of the financial results for the second fiscal quarter ending September 30, 1998 was necessary. Telxon's earnings were eventually restated downward in excess of 9% in fiscal year 1996, 16% in 1997, and 46% in 1998. Telxon's first quarter of 1999 was restated downward 200% from a profit to a loss, and the second quarter of 1999 earnings restated downward 200% from a profit to a loss. According to plaintiffs, when the financial results were restated, over $18,168,000 in previously reported earnings disappeared, effectively eliminating all profits and growth Telxon publicly had claimed to be experiencing for the past three years.

Telxon fired defendants Brick and Haver in March of 1999. In July of 1999, Telxon dismissed the outside auditors it had used for the fiscal years in which it restated its financial results.

The Court will briefly review the alleged fraudulent misstatements and accounting manipulations, as well as any significant events related to Telxon, that occurred in each fiscal year and financial quarter beginning in Fiscal Year 1996.

**Fiscal Year 1996**

On May 21, 1996, the beginning of the class period, Telxon announced its fourth quarter of fiscal year 1996 and its fiscal year 1996 financial results in a press release. According to the press release, Telxon had a net income of $16.5 million, or $1.04 per share, on revenues of $417.72 million. The press release stated that:

> When we began redesigning Telxon three years ago, we said that all of our strategies and tactics would be aimed at producing sustainable long-term profitable growth for our shareholders. We have been consistent in that pursuit, sacrificing near term gain for longer-term sustainable gains which produce more lasting value.... The 42% increase in fourth quarter revenues and the 28% increase in revenues for fiscal 1996 reflect the early results of these efforts.

See Complaint ¶ 37.

In its 1996 Form 10–K, filed with the SEC on July 1, 1996, Telxon stated:

> Fiscal 1996 results represented a continuation of the revenue and earnings growth which began in late fiscal 1994. In fiscal 1996, revenues increased 28% as compared to fiscal 1995 while costs and operating expenses decreased as a percentage of total revenues for the same period. For fiscal 1996, the Company reported net income of $16.5 million or $1.00 per share.

> \* \* \* \* \* \*

> The Company anticipates its first half of fiscal 1997 results to reflect approximately 5% revenue growth and a loss of approximately $.50 per share due to changing market conditions... The Company anticipates a return to profitability in the second half of fiscal 1997.

See Complaint ¶ 38.

Plaintiffs allege that Telxon made three materially false and misleading statements in its fiscal year 1996 financial statements.

First, in violation of GAAP, Telxon improperly recognized $2 million in revenue relating to the sale of a software license to a third party under a promissory note. Plaintiff alleges that Telxon should have known that payment under the promissory note was not reasonably assured. Plaintiff contends that this misstatement alone resulted in an overstatement of net income of nearly $1.6 million, $0.10 per share, or 20% of Telxon's net earnings for the fourth quarter of fiscal year 1996. Also in violation of GAAP, Telxon understated its charges for inventory obsolescence by $490,000 and understated its charges for sales returns and allowances by $342,000.

**First Quarter 1997.**

On July 17, 1996, Telxon issued a press release announcing its financial results for the first quarter of fiscal year 1997, ending on June 30, 1996. Telxon announced a $ 4.8 million loss, but assured investors that its new management strategies were on track. In this quarter, defendant Brick was elevated to the position of CEO. Defendant Haver reported that:

> successful implementation of our cost-cutting initiatives should allow Telxon to return to profitability, on sales growth of 8–10% in the second half sufficient to produce profits for the full year.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> We have begun the process of streamlining operations across the board at Telxon. We have already taken steps to reduce the number of products offered and to achieve greater efficiencies in manufacturing.... Actions taken to date and in process are expected to decrease costs by $4.5 to $5.0 million per quarter from current run-rates. We will continue to review all aspects of our business and expect to take further actions to achieve more effective and efficient operations.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Our sales and marketing force is the best in serving our targeted vertical markets. Our renewed focus on cost containment and efficiency should produce the sustainable long-term growth

in profits we expect and allow us to continue to supply industry leading products and services to our customers. *See* Complaint ¶ 47.

Plaintiffs allege that Telxon made two materially false and misleading statements in its Form 10Q, which was signed by defendant Haver. In violation of GAAP, plaintiffs allege Telxon "improperly recognized revenue that resulted in $733,000 overstatement in pre-tax income relating to software license revenues and assets" and "improperly included accounts receivable of $642,000 on its books which should have been written off as uncollectible bad debt." *See* Complaint ¶ 54. This resulted in Telxon overstating its revenues by $402,000 and understating its net loss by $767,000 or $0.06 per share.

**Second Quarter 1997**

In the second quarter of 1997, Telxon again reported a net loss, but continued to assure investors of its cost-cutting management initiatives. In an October 18, 1996 press release, Telxon stated:

> The early benefits of these initiatives have been only partially reflected in our fiscal 1997 Q2 results. Benefits from these phased initiatives are expected to be fully realized over the next three to four quarters. We expect the total impact of these initiatives under all phases, once fully implemented, to generate overall annual cost reductions in excess of $ 40 million below historical run-rates.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Our gross profit margins, as a percentage of sales, are expected to increase over the next 2–3 quarters, as cost reductions are implemented and planned efficiency improvements are more fully realized.

*See* Complaint ¶ 57. Plaintiffs contend that these statements forced Telxon to make good on its promises to report a positive net income over the next two to three quarters.

Plaintiffs allege that, in Telxon's Form 10–Q, Telxon materially misrepresented its

financial results by improperly recognizing $149,000 in pre-tax income relating to software license revenues and assets in violation of GAAP. Plaintiffs also allege that Telxon overstated its net loss by $317,000, or $0.02 per share.

### Third Quarter 1997

On January 23, 1997, Telxon issued a press release announcing its results for the third quarter, ending December 31, 1996. Telxon announced that it returned to profitability, with revenues of $123.6 million and a net income of $2.1 million, or $0.13 per share. It also expressed optimism about continuing profitability as a result of management cost-cutting policies. In the press release, Brick stated:

> During the third quarter of fiscal year 1997, we continued the implementation of the cost reduction and efficiency improvement initiatives we started last quarter and took an initial step towards recognizing the underlying value of our technical subsidiaries, as evidenced by the sale of Itronix. I am pleased with the positive sequential operating and financial trends we have been experiencing. During the third quarter, we experienced a strong book-to-bill rate, as our ending backlog increased by over $10 million. Q3 gross profit margins, as a percentage of sales, excluding $12.1 million on non-recurring charges, improved sequentially to 37.3 %. Our gross profit margins are expected to continue to increase as cost reductions and planned efficiency improvements are more fully realized.

> \* \* \* \* \* \*

> We continue to streamline product lines, improve productivity, and decrease operating costs, and as a result, we expect to see continued improvement in gross margins as well as reduced operating expenses. We anticipate that these actions will enhance both the company's future opportunities for profitability and

its competitive position in the global marketplace.

Complaint ¶ 64. Defendant Haver added:

> The benefits of our various cost reduction initiatives which were only partially reflected in our fiscal 1997 Q2 results, have been further reflected in our Q3 results. Benefits from these phased initiatives are expected to be fully realized in early fiscal 1998. We expect the total impact of these initiatives, once fully implemented, to generate overall cost reductions in excess of $40 million below peak historical rates.

Complaint ¶¶ 65.

On February 14, 1997, Telxon published its financial results for the third quarter of 1997 in its Form 10Q. Plaintiffs allege that those financial statements were in violation of GAAP and materially false and misleading in a number of ways: (1) Telxon improperly recognized $114,000 in pre-tax income relating to software license revenues and assets; (2) Telxon recorded $2,650,000 in charges relating to the streamlining of international operations though requirements for accrual of severance costs under GAAP had not been met; and, (3) Telxon improperly capitalized $750,000 in product purchase advances which should have been expensed as research and development costs because such purchases were not made. Plaintiffs allege that, during this period, as a result of these improper accounting practices, Telxon overstated its revenues by $200,000 and understated its earnings by $1.16 million or $0.07 per share.

### Fourth Quarter and Fiscal Year 1997

On April 28, 1997, Telxon issued a press release announcing preliminary financial results for the fiscal 1997 fourth quarter and year end. Telxon reported that it was profitable that quarter and remained optimistic about its future financial prospects. In the press release, Brick stated:

> Preliminary results for the fourth quarter include, revenues of $121 million, a 20% sequential increase over rev-

enues from continuing operations in Q3 and gross profit margins above 39%, an increase of 2% over Q3 and 7% over the first half of fiscal 1997.

\* \* \* \* \* \*

I am confident in our team's ability and commitment to increase value for our shareholders, customers and employees. We have not realized the majority of the benefits of our initiatives to lower our product costs, improve our operating efficiencies and lower our overall operating expenses.... As previously indicated we support analyst's estimates for continued revenue and earnings growth for fiscal 1998.

Complaint ¶ 73.

Telxon issued another press release a few weeks later on May 20, 1997, announcing the actual results for the fourth quarter and fiscal year 1997, which were in keeping with the preliminary numbers. Brick stated in response to these numbers that:

With our new business model in place, and a culture that strives for continuous operating improvements in all areas of our business, I am confident that we can drive profitable growth on a predictable and continuing basis.

Complaint ¶ 75.

On June 30, 1997, Telxon filed its form 10–K. Plaintiffs allege that those financial statements were in violation of GAAP and were materially false and misleading in a number of ways: (1) Telxon improperly recognized $3,142,000 in product revenue and related cost of product sales of $1,696,000 which should have been recognized on a straight-line basis over the term of the lease; (2) Telxon improperly included $700,000 in its accounts receivable that should have been recorded as a bad debt relating to a foreign distributor; (3) Telxon improperly did not record charges of $1,300,000 relating to the streamlining of international operations; (4) Telxon overstated its charges for inventory reserves by $721,000; (5) Telxon understated its accrual for professional fees by $178,000; and, (6) Telxon understated its general bad debt provision by $232,000. As a result of these alleged accounting manipulations, Telxon overstated its revenues by $3.95 million, and overstated net income by $1.9 million for the fourth quarter of 1997, resulting in a $.02 per share profit, which should have been reported as a $0.10 per share loss.

**First Quarter 1998**

On July 22, 1997, Telxon issued a press release announcing its financial results for the first quarter of fiscal year 1998. Telxon again reported a profit, stating that its revenues increased 15% to $104.9 million and its net income increased to $1.6 million or $0.10 per share. On August 14, 1997, Telxon filed its form 10–Q. Plaintiffs allege that those financial statements were in violation of GAAP and were materially false and misleading in a number of ways: (1) Telxon understated its bad debt charges by $2,010,000 on past due accounts receivable owned by a foreign distributor; (2) Telxon improperly recognized $273,000 in pre-tax income relating to software license revenues and assets; (3) Telxon improperly did not record charges of $90,000 related to the streamlining of international operations; (4) Telxon improperly overstated its charges for inventory reserves by $140,000; and, (5) Telxon understated charges relating to its leased facilities by $110,000. Plaintiffs allege that, as a result of Telxon's improper accounting practices, Telxon overstated its revenues by $691,000 and overstated its net income by $1,468,000 or $0.09 per share.

**Second Quarter 1998.**

On October 20, 1997, Telxon issued a press release announcing its financial results for its second quarter of fiscal year 1998 ending September 30, 1997. Telxon stated that its revenue had increased to $110.3 million, and its net income had increased to $2.4 million, or $0.15 per share, a 50% increase per share over the second quarter of 1997. On October 27, 1997, Brick again expressed optimism about Telxon's potential, stating "I am confident that our operating results will continue to

improve as we experience the benefits of our on-going initiatives to reduce costs, improve operating efficiencies and drive salary growth through new product innovation" Complaint at ¶ 87.

On November 14, 1997, Telxon published its form 10Q. Plaintiffs allege that those financial statements were in violation of GAAP and were materially false and misleading in an number of ways: (1) Telxon improperly recognized $418,000 in pre-tax income relating to software license revenues and assets; and (2) Telxon failed to expense severance charges of $210,000 related to the accrual of costs for the Company's international operations. As a result of Telxon's alleged improper accounting practices, plaintiffs allege Telxon overstated its revenues by $191,000 and overstated its income by $250,000 or $0.02 per share.

## Third Quarter 1998

On January 20, 1998, Telxon issued a press release announcing its financial results for the third quarter of fiscal year 1998. Telxon again reported a profitable quarter. Revenues increased to $117.3 million and net income rose to $4.4 million, or $0.27 a share. Brick again expressed confidence in Telxon's "ability to generate consistent and predictable revenue and operating earnings growth." Complaint at ¶ 94.

On February 17, 1998, Telxon filed its Form 10–Q. In that form the company emphasized its focus on streamlining its product offerings and disposing of obsolete inventory. Plaintiffs allege that those financial statements were in violation of GAAP and were materially false and misleading in a number of ways: (1) Telxon failed to properly reserve for a $650,000 past due accounts receivable owed by a foreign distributor; (2) Telxon improperly recognized $534,000 in pre-tax income relating to software license revenues and assets; (3) Telxon failed to expense $320,000 in severance charges related to the accrual of costs for the Company's international operations; (4) Telxon failed to expense $380,000 for the settlement of certain contingencies related to the divestiture of Itronix; and, (5) Telxon did not reflect a $1,434,000 asset impairment of a note receivable due from a foreign distributor. As a result of these alleged accounting manipulations, Telxon overstated its revenues by $109,000 and overstated net earnings by $1.87 million or $0.12 per share.

## Fourth Quarter and Year End Fiscal 1998.

In early April of 1998, Symbol Technologies, Inc. expressed interest in a business combination with Telxon. In its initial offer, Symbol offered Telxon $38 per share, nearly a 40% premium over Telxon's then current trading price of $27.6754. Telxon rejected this offer. On May 8, 1998, Telxon issued a press release stating that it did not believe a business combination between Symbol and Telxon was in the best interests of the shareholders.

> Telxon Corporation announced today that having reviewed Symbol Technologies, Inc.'s (N.Y.SE: SBL) indication of interest outlined in Symbol's April 8 letter to Telxon, Telxon's board of directors unanimously has determined that Symbol's suggested business combination is not in the best interest of Telxon and its shareholders.
>
> Speaking on behalf of the board of directors, Frank Brick, Telxon president and chief executive officer said, "Given Telxon's strength, performance and strategic growth plan, the board remains convinced that it is clearly inappropriate to sell the company on the terms set forth in the Symbol letter. In the board's view, Symbol's $38 price is inadequate. Moreover, we believe a Symbol/Telxon combination raises troubling questions that have not been addressed by Symbol."
>
> "The Telxon team remains strongly focused on providing our customers with world-class mobile information systems, increasing shareholder value through the development of innovative new products, continuous operating performance

improvements and expansion of our strategic marketing and technology alliances, Telxon's success in generating consistent revenue and earnings growth over the last six quarters is evidence of our continued commitment to executing our business plan with respect to both our core business and our investment in forward-looking technologies," Brick said.

Complaint ¶ 104. Plaintiffs contend that this was a materially false and misleading statement, because Telxon's financial condition was allegedly faltering at the time. Plaintiffs allege that, "in addition to the accounting problems ..., product demand was waning, manufacturing inefficiencies were increasing, millions of dollars in products held in inventory had become or were about to become obsolete, and delays were occurring in connection with deployment of its new pen-based products." *Id.* Plaintiffs also allege that defendants did not want to accept Symbol's bid, because it would have to open its books and records for Symbol to conduct a due diligence review, thereby revealing its true financial status.

On May 12, 1998, the Akron Beacon Journal ran an article about Telxon and its continuing rejection of Symbol's $38 bid. Brick again expressed optimism about Telxon's growth and profitability.

> Breaking a nearly three-week silence, Telxon Corp, CEO Frank Brick yesterday accused his company's suitor, Symbol Technologies, Inc., of trying to pressure Telxon to agree to Symbol's $38 per-share buy-out offer.
>
> He urged shareholders to stick with Telxon management's decision last week to reject the $830 million offer out of hand, and added that he believes that the company's stock price—which sank 1⅞₂ yesterday to close at 33⅜₂—could hit the $38 mark soon anyway.
>
> \* \* \* \* \* · \*
>
> They [Symbol] were concerned that the affordability of doing (the acquisition) would pass them by," Brick said. "They moved quickly, created a distraction and

tried to buy the company cheaper. We're just not interested in selling it cheaply. We can get to 38 on our own."

\* \* \* \* \* \*

But negotiations, or the lack of them, isn't what made Telxon turn away from Symbol's offer, Brick said.

A huge backlog of orders, new pen-based computers, a 10 percent operating margin, a shrinking price-to-earnings ratio and a string of quarters of meeting or beating analyst's earnings estimates has shown that the struggling Telxon of old is being supplanted by a new Telxon, Brick said.

Plaintiffs allege that, through these press releases touting Telxon's financial viability and successful management team, Telxon was able to keep its stock price above $33 per share and, thus, justify its rejection of Symbol's offer.

On May 18, 1998, Telxon issued a press release announcing its financial results for the fourth quarter of 1998 and fiscal year 1998. Telxon reported after-tax operating earnings of $16.4 million, or $1.01 per diluted share for fiscal year 1998. For the fourth quarter, Telxon reported revenue of $133.3 million and a net income of $0.50 per share. Plaintiffs allege that Telxon overstated its fourth quarter earnings by more than 85%.

On June 2, 1998, it was reported that Symbol submitted a new offer to Telxon of $42 a share in cash and stock or $40 a share in cash. Telxon stock fell $2.83 in response to this announcement. The following day the Plain Dealer published a story about Symbol in which Brick stated that "Telxon's stock would reach Symbol's $38–a–share offer in 12 to 18 months." Plaintiffs contend that this statement caused Telxon's stock to rise. On June 4, 1998, plaintiffs allege that Telxon's stock rose to its highest point during the class period, $35¹⁵⁄₁₆ per share. On June 5, 1998, Telxon rejected Symbol's $40 per share offer. Telxon stated in a press release that its board had "unanimously rejected

an unsolicited $40 cash proposal from Symbol... [because] Symbol is unwilling to offer Telxon's shareholders a proposal that gives them fair value for their shares." Complaint ¶ 111. On June 8, 1998, Telxon allowed the $42 offer to expire, stating that it "did not contain enough information to be considered by the Telxon board." *Id.*

On June 12, 1998, it was reported that Guy Wyser–Pratte initiated a proxy battle on behalf of the shareholders to force Telxon to stop its opposition to the take-over bid and to amend Telxon's by-laws and elect new board-members. Wyser–Pratte wished to amend the by-laws so that Telxon's board of directors did not have the power to block a take-over bid.

On June 29, 1998, Telxon filed its form 10–K with the SEC. The form 10–K contained the previously announced financial results and statements of optimism about Telxon's future revenues. Plaintiffs allege that those financial statements were in violation of GAAP and were materially false and misleading in a number of ways: (1) Telxon improperly included $337,000 in accounts receivable on its books that should have been written off in that quarter·as an uncollectible bad debt; (2) Telxon improperly recognized $543,000 in pre-tax income relating to software license revenues and assets; (3) Telxon failed to record impairment charges aggregating $4,635,000 relating to uncollected notes receivable from its FY 1997 divestiture and investment in certain retail software operations; (4) Telxon failed to record $730,000 in charges related to the accrual of costs for the streamlining of international operations; (5) Telxon improperly recognized a gain of $900,000 related to its sale of Virtual Vision stock because all conditions of the sale were not satisfied prior to the end of FY 1998; (6) Telxon failed to record inventory obsolescence charges of $1,105,000; and, (7) Telxon improperly recognized $1,900,000 in sales and a nearly equal amount in costs of sales where inventory was shipped to a company location rather than a customer. As a result of these improper accounting practices, plaintiffs allege Telxon overstated its revenues in the fourth quarter of 1998 by $1.941 million and overstated its income by $3.68 million or $0.23 per share. For the Fiscal Year 1998, Telxon overstated its income by $7,048,000 or $0.44 per share.

**First Quarter 1999.**

The proxy battle between Wyser–Pratte and Telxon continued into the first quarter of 1999. Plaintiffs allege that Telxon wished to keep negative financial news from the shareholders because it would adversely impact Telxon's stock price and strengthen Wyser–Pratte's chance of prevailing in the proxy battle.

On June 13, 1998, Telxon announced its expected financial results for the first fiscal quarter, ending June 30, 1998. Telxon reported revenues of $124.4 million, and earnings of $3.6 million or $0.22 per share (diluted), excluding non-recurring items of $1.1 million after-tax. It again met analysts expectations, showing increased revenues and profitability. Brick again expressed optimism about Telxon's future growth and profitability. On that same day, the Dow Jones News Service reported that Telxon was comfortable stating that it could increase its revenue by 15% a year, and its earnings by 30%. Telxon also announced at that time that it was filing a lawsuit against Wyser–Pratte asking that he be enjoined from soliciting proxies for proposals.

On July 14, 1998, the Plain Dealer reported that Brick stated that he was "confident about a 30 percent gain in earnings from operations for the full fiscal year." Complaint ¶ 56. On July 20, 1998, Telxon issued a press release that quoted Brick:

> I am pleased that we achieved our earnings growth target during the quarter. I remain excited and confident in our ability to execute our business plan, which is targeted to deliver double-digit revenue growth and 30% earnings growth for fiscal 1999.

Complaint ¶ 122.

On August 14, 1998, Telxon filed its form 10–Q for the first quarter of 1999, essen-

tially stating the same figures that had been disclosed in the press release. Telxon again expressed optimism about its ability to generate increased revenues and profits in the future. Telxon especially cited its increase in volume of pen-based product sales. Telxon also stated that it increased its inventory allowance accounts as a result of provisions for inventory obsolescence.

Plaintiffs allege that, at this time, Telxon's pen-based products were encountering substantial technological and design problems as well as customer acceptance problems. The introduction of these new products were, at the same time, rendering large portions of Telxon's inventory obsolete, for which Telxon was not accounting properly. Plaintiffs also allege that Telxon's effort to increase sales to Value Added Distributors was resulting in many non-standard sales agreements, requiring Telxon to increase its reserves for potential sales returns, which Telxon did not do.

Plaintiffs allege that those financial statements were in violation of GAAP and were materially false and misleading in a number of ways: (1) Telxon overstated its revenue by failing to provide for $3,963,000 in needed sales returns reserves and also overstated the related cost of sales by $1,902,000 resulting in a net $2,061,000 overstatement of pre-tax income; (2) Telxon failed to make provision for an uncollectible past due accounts receivable of $2,181,000 related to a foreign distributor; and, (3) Telxon overstated its charge for inventory reserves by $697,000. As a result of these improper accounting practices, plaintiffs allege that Telxon overstated its revenues by $3.88 million and overstated its net income by $346,000 or $0.02 per share.

Telxon also included in its proxy materials generally optimistic statements about the company. On August 26, 1998, Telxon settled the proxy battle with Wyser–Pratte. In connection with the announcement of this settlement, Brick was quoted as saying "Telxon will continue to execute its long-term strategy that is geared towards growing earnings 30% per year on a 15% revenue gain." After Telxon's annual meeting, Brick continued to express optimism about increased earnings and revenue.

**Second Quarter 1999.**

On September 30, 1999, Telxon issued a press release reporting its financial results for the second quarter of 1999. Telxon reported substantial gains in revenue and earnings when compared to the same quarter last year. Plaintiffs allege that Telxon was able to report those gains because it inflated its earnings by recording revenue of $14.1 million for products shipped to a distributor, MRK, who had the right to return the unsold product to Telxon, or to collect from Telxon if one of its customers did not pay for the product. Plaintiffs allege that Telxon also recognized over $6.9 million in revenues for product sold to a customer for which Telxon had guaranteed lease payments to a third-party lessor.

On October 22, 1998, Telxon filed these positive financial results in a Form 8–K with the SEC. In a press release issued on that same day, Brick expressed optimism about Telxon's future growth and profits. Brick stated that he believed Telxon would achieve its financial objectives for the second half of 1999. On October 26, 1998, a newspaper reported that "Telxon expects annual growth of 15% with expenses expected to rise only 7.5%." Brick further stated that sales to warehouses and logistics customers rose about 24% last year and that "[w]e see those businesses continuing at that growth rate for the rest of the year." Complaint at ¶ 138. Telxon's stock rose from $16.50 on October 20, 1998 to a high of $30.125 on December 9, 1998.

On November 20, 1998, Telxon filed its form 10–Q for the second quarter of 1999. Telxon reported a net income of $2.5 million or $0.15 per common share for the second quarter. Telxon attributed its positive results to increases in shipments of its product and increase in the selling price of some of its products. Telxon also rep-

resented that it had adequately provided for inventory obsolescence. Plaintiffs allege that those financial statements were in violation of GAAP and were materially false and misleading in a number of ways: (1) Telxon improperly recognized $14,100,000 in product revenue and $6,837,000 in costs of product revenue associated with a product financing arrangement even though the criteria for revenue recognition had not fully been satisfied in accordance with GAAP;[1] (2) Telxon improperly recognized $6,984,000 in product revenues and a corresponding $4,719,000 in cost of product even though the Company had guaranteed the customer's lease payments to a third party lessor; (3) Telxon improperly recognized $2,000,000 in revenues relating to software license revenues even though contingencies related to the customer's acceptance of the software had not been satisfied; (4) Telxon improperly understated its bad debt expense by $1,012,000 due to its failure to provide for uncollectible accounts receivable related to a foreign distributor; (5) Telxon overstated its charge for inventory reserves by $868,000; and, (6) Telxon improperly recognized $262,000 in pre-tax income relating to software license revenues from a previously divested software operation.

Plaintiffs allege that, as a result of these improper accounting practices, Telxon overstated its revenue by over $20.7 million and overstated its net earnings by $8.8 million or $0.54 per share. This was the last quarterly financial disclosure before Telxon issued its restatements.

**The Restatements**

On December 11, 1998, not even a month after filing its form 10Q, Telxon restated its financial disclosures for the second quarter of fiscal year 1999. On February 23, 1999, Telxon announced that it would restate its SEC financial disclosures for the fiscal years and financial quarters beginning with March 31, 1996 through to the second fiscal quarter of fiscal year 1999. On June 16, 1999, Telxon announced that it would further restate the second quarter 1999 financial results. Overall:

FY 1996 earnings went from $16.5 million, or $1.00 a diluted share to $15 million or $0.91 a diluted shared. Revenue went from $486.5 million to $484.1 million.

FY 1997 loss went from $7.1 million or $0.44 a diluted share to $8.3 million or $.051 a diluted share. Revenue went from $466 million to $461 million.

FY 1998 earning went from $15.2 million or $.93 a diluted share to $8.2 million or $0.50 a diluted share. Revenue went from $465.9 million to $463.2 million.

Q1 1999 earnings went from $246,000 or $0.01 a diluted share to a loss of $100,000 or $0.01 a diluted share. Revenue went from $115 million to $111.2 million.

Q2 1999 earnings went from $2.5 million or $0.15 a diluted share to a loss of $6.3 million or $0.39 a diluted share. Revenue went from $124.4 million to $103.6 million.

*See* Plaintiffs' Opposition at p.10. In March of 1999, Telxon fired defendants Brick and Haver and also dismissed the outside auditors it had used for the fiscal years in which it restated its financial results.

On August 10, 1999, Telxon announced in its Form 10–K for the fiscal year 1999, a net loss of $137 million, or $8.50 share.

**Scienter**

Plaintiffs allege that defendants acted with scienter in allegedly materially misstating Telxon's quarterly and annual financial results and making public statements about Telxon's earnings potential. Plaintiffs allege that Brick and Haver were Telxon's highest ranking officers and, thus, had access to all information concerning the Company's financial condition. Brick and Haver also controlled the content of

---

**1.** Plaintiffs allege this transaction was actually a loan, on which Telxon paid interest, that was only considered repaid as the product serving as collateral was sold to the customer's customer's customer.

Telxon's public statements and SEC filings. According to plaintiffs, given the extreme nature of the misreporting that occurred during the relevant time frame, Brick and Haver, as financially sophisticated individuals, had to have been aware of Telxon's true financial condition, but chose, instead, to furnish inaccurate data to the SEC and to the public.

Plaintiffs allege that these misrepresentations benefitted Brick and Haver personally, because it helped solidify their positions as leaders of the company and because both were entitled to significant bonus compensation in the form of cash and stock options upon Telxon achieving certain financial objectives. Plaintiffs allege that, during the class period, Brick received $750,000 in bonus compensation and bonus stock options for 250,000 shares, because Telxon met its financial objectives for the years of 1997 and 1998. Haver received $400,000 in bonus compensation and bonus stock options for 75,000 shares, also because Telxon met its financial goals in 1997 and 1998.

Plaintiffs allege that Brick and Haver manipulated Telxon's financial disclosures in order to gain credibility with the investing public. Brick and Haver were new to Telxon's highest positions, and needed to prove that their management would provide shareholders with predictable, growing profits, as they promised the public it would when they first took over their positions, and as they continued to promise Telxon's shareholders throughout their tenure.

Plaintiffs also allege that Symbol, Inc.'s uninvited takeover bid, and Wyser-Pratte's proxy battle provided a further impetus for Brick and Haver to manipulate Telxon's accounts. Plaintiffs assert that Brick and Haver needed to continue to report profits and growth in order to stave off the unwanted takeover attempt, to win the proxy battle, and to avoid close scrutiny of their financial practices.

Plaintiffs finally allege that Telxon needed to manipulate its financial disclosures in order to maintain Telxon's lines of credit with several lending institutions. Plaintiffs allege that, if Telxon had accurately reported its financial data during the class period, its financial loan covenants would have been jeopardized. Once Telxon restated its financial disclosures, it had to obtain a waiver of default from its banks for all prior periods in which it restated its financial disclosures.

## II. MOTION TO DISMISS STANDARD FOR SECURITIES FRAUD COMPLAINTS

In deciding a motion to dismiss under Rule 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff. *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 111 S.Ct. 1842, 1845, 114 L.Ed.2d 366 (1991); *Dana Corp. v. Blue Cross & Blue Shield Mut.*, 900 F.2d 882 (6th Cir.1990); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489 (6th Cir.1990). However, the Court need not accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). A well-pleaded allegation is one that alleges specific facts and does not merely rely upon conclusory statements. In the context of a motion to dismiss a securities fraud claim, a court "may consider the full texts of the SEC filings, prospectus, analyst's reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment under Rule 56." *In re Royal Appliance Secs. Litig.*, 1995 WL 490131, at *2 (6th Cir. Aug.15, 1995).

### A. Elements of § 10(b)

To state a claim under § 10(b) of the Securities and Exchange Act of 1934 ["Securities Act"] and Rule 10b–5, a plaintiff must allege in connection with the purchase or sale of securities, (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff justifiably relied, and, (5)

which proximately caused the plaintiff's injury. *In re Comshare, Inc.*, 183 F.3d 542, 548 (6th Cir.1999). Of all the above factors, defendants argue in their motion to dismiss only that plaintiffs' complaint fails to allege adequately that defendants acted with scienter. Scienter generally refers to a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The exact mental state required to establish scienter in the context of a claim under Rule 10b–5 will be discussed below.

### B. Pleading Standard under Fed. R. Civ. Proc. 9(b).

■ A complaint for securities fraud, just as a complaint for any type of fraud, must satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

A sufficient level of factual support for a 10b–5 claim may be found where the circumstances of the fraud are pled in detail. "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990).

### C. Pleading Standard under PSLRA

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA") which heightened the pleading standard in securities litigation. The PSLRA requires a plaintiff to state with particularity all facts supporting an allegation made on information and belief, and all facts establishing scienter. Section 78u–4(b) states:

> (b) Requirements for securities fraud actions
>
> **(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

> **(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1) & (2).

The Sixth Circuit, in *In re Comshare, Inc. Securities Litigation*, 183 F.3d 542, 551 (6th Cir.1999), held that plaintiffs may meet PSLRA pleading requirements "by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud." *Id.* The *Comshare* Court defined recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger may not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 550 (*citing Mansbach v. Prescott*, 598 F.2d 1017, 1025 (6th Cir.1979)). Recklessness is to be understood as a "mental state apart from negligence and akin to conscious disregard." *Id.*

■ The *Comshare* Court, in explaining the role allegations of motive and opportunity play in the assessment of scienter, stated:

> We cannot agree that under the PSLRA, plaintiffs may establish a "strong inference" of scienter merely by alleging facts demonstrating motive and opportunity where those facts do not simultaneously establish that the defendant acted recklessly or knowingly, or with the requisite state of mind. While facts regarding motive and opportunity may be "relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred," *In re Baesa*, 969 F.Supp. at 242, and may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct, the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter.

*Id.* (footnote omitted). Thus, in order to determine whether scienter has been pled adequately under the PLSRA, the Court is to consider allegations of motive and opportunity, but should not, except in the most blatant of cases, deem such allegations sufficient to state a securities fraud claim. The Court, rather, must assess whether the allegations in the complaint, taken as a whole, including those relating to motive and opportunity, give rise to a strong inference of recklessness on the part of the defendants.

In adopting this standard, the Sixth Circuit expressly rejected the views of those courts with both broader and narrower views of the PSLRA. Thus, the *Comshare* Court *rejected* the view espoused by a number of courts, including the Second Circuit, that the PSLRA simply requires a plaintiff to either (1) allege facts constituting strong circumstantial evidence of conscious or reckless behavior, or (2) allege facts showing a defendant's motive and opportunity to commit fraud. *Id.* at 549. And, the *Comshare* Court *rejected* the view, espoused by the district court in that case, that a plaintiff must allege facts indicating a knowing misrepresentation or conscious intent to defraud before a complaint can pass muster under the PSLRA. *Id.* at 551–52.

Instead, the *Comshare* Court, after a careful analysis of the plain language of the PSLRA, concluded that, while a plaintiff may state a valid claim under the PSLRA premised on recklessness alone (as distinct from knowing misconduct), the facts alleged collectively must give rise to a "strong inference" that the defendants did, indeed, behave recklessly. Thus, the Sixth Circuit employs a form of "totality of the circumstances" analysis; this Court, accordingly, declines to examine plaintiffs allegations in piecemeal fashion and, will instead, assess them collectively to determine what inferences may be drawn therefrom.

### III. LAW & ANALYSIS

Plaintiffs have clearly shown, and defendants do not dispute, that Telxon misstated material facts in both its press releases and its financial disclosures to the SEC. Indeed, defendants are not in a position to dispute this issue; Telxon, itself, admitted its prior disclosures were materially misstated when it issued the restatements which gave rise to this litigation. *See In re Peritus Software Services, Inc., Sec. Litig.*, 52 F.Supp.2d 211, 223 (D.Mass. 1999) (stating that "after the fact accounting admissions may suffice to show that material misstatements occurred"); *In re Sciences Corp. Sec. Litig.*, 58 F.Supp.2d 682, 688 (E.D.Va.1999). Nor do defendants dispute that plaintiffs sufficiently alleged reliance, causation and damages.

Defendants do dispute, however, whether plaintiffs have pled scienter in regard to those material misstatements with the particularity required by the PSLRA. The Court finds that plaintiffs have alleged facts which give rise to a strong inference of reckless conduct on the part of Telxon, Brick and Haver by: (1) citing to Telxon's extreme restatements of its prior financial disclosures over a three year period, (2) identifying blatant violations of GAAP and

other basic accounting principles resulting in those misstatements, (3) pointing to factors that should have alerted defendants that the financial data it was releasing to the public was incorrect, (4) describing motivations for management to misstate Telxon's financial data, and, (5) explaining the opportunities presented to Brick and Haver to control the nature and public dissemination of Telxon's financial data.

Defendants cite to four deficiencies in plaintiffs' complaint which they believe militate in favor of a contrary conclusion, and which they believe are fatal to plaintiffs' effort to pursue their claims beyond the pleading stage. Defendants argue that (1) the complaint fails to state facts, instead relying on "information and belief allegations"; (2) the Complaint relies heavily upon motive and opportunity allegations, which the *Comshare* Court has said are insufficient; (3) errors in the application of accounting principles are not sufficient to give rise to an inference of improper intent; and, (4) the forward-looking statements referred to in the complaint are protected by the PSLRA's safe-harbor. According to defendants, these pleading deficiencies deprive plaintiffs' complaint of the kind of particularity Congress meant to require under the PSLRA.

### A. Information and Belief Allegations

█ Facts underlying allegations based on information and belief must be described with particularity. See 15 U.S.C. 78u4(b)(1) & (2). Defendants contend that, because all of plaintiffs' allegations are based on nothing more than information belief, plaintiffs have not met this burden. See *Lirette v. Shiva*, 27 F.Supp.2d 268, 275 (D.Mass.1998) ("Pleadings based on information and belief, without specifying the source of the information and the reasons for the belief, do not pass muster"). While the Court does not disagree with the basic legal principle defendants espouse, it does disagree with defendants' characterization of plaintiffs' complaint.

The complaint relies on publicly filed documents, press releases and other public statements made by Telxon and defendants Brick and Haver. The complaint also alleges publicly known facts about Telxon, such as Symbol's takeover bid, the proxy battle, and the compensation package under which Brick and Haver operated. Plaintiffs state when each of these public disclosures was made, who made them, where they were released (to either the SEC or the public), what was contained in each one, and why each of the statements contained material misrepresentations. Plaintiffs further provide several reasons for why defendants would want to make these material misrepresentations. It is apparent from a review of the complaint, accordingly, that plaintiffs do not fall back on "information and belief" allegations to any meaningful extent. To the extent such allegations do appear, moreover, it is equally apparent that plaintiffs specify in great detail the source of this information and the precise reasons for their beliefs. That is all the PSLRA requires. *See, e.g., Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 233 (D.Mass.1999)("Because [plaintiff] bases his beliefs on [the company's] Securities and Exchange Commission filings and press releases that disclose the restatement of the second quarter results, this Court concludes that [plaintiff's] allegations are based on particularized facts, even to the extent he relied on 'information and belief.' "); *In re Digi, Intern., Inc., Sec. Litg.*, 6 F.Supp.2d 1089, 1096 (D.Minn.1998) (finding sufficient particularity in a complaint that specified (1) misleading public statements and who was responsible for disclosures, (2) why those disclosures were misleading (3) the difference between the company's original financial disclosures and revised financial disclosures and (4) facts demonstrating a motive (sale of shares and compensation structure)).

### B. Motive & Opportunity

█ Defendants next assert that the complaint merely alleges a motive and op-

portunity to commit securities fraud, and that such allegations are not sufficient to allege scienter. *See In re Comshare,* 183 F.3d at 551. While bare allegations of motive and opportunity, without more, are no longer available as an independent prong on which a showing of scienter may be grounded, the *Comshare* panel did not hold that motive and opportunity can never be considered, nor did it hold that motive and opportunity can never be enough to establish scienter. *See Id.* (stating that allegations of motive and opportunity are still relevant, and "may on occasion rise to the level of creating a strong inference of reckless or knowing conduct"). The Court, therefore, may and, indeed, must consider allegations of motive and opportunity *in conjunction with the remainder of plaintiffs' allegations* to determine whether the allegations, on the whole, raise an inference of recklessness or knowing disregard.

■ On the issue of motive, plaintiffs allege that defendants Brick and Haver were under substantial pressure to improve performance after several initial quarters of poor performance under their oversight. Specifically, plaintiffs allege that Brick and Haver made various public statements regarding their own management abilities and the wisdom of changes they implemented and, thus, were pressured to live up to those statements. Plaintiffs allege, moreover, that Brick and Haver were motivated by the promise of substantial additional compensation to make sure their predictions of profitable performance became a reality. Finally, plaintiffs allege that Brick and Haver were motivated by the need to stave off Symbol's take over efforts and ensuing proxy-battle and, thus, avoid detailed scrutiny of their prior accounting practices—a need which translated into an escalation of Telxon's financial misstatements as Brick and Haver attempted to justify their rejection of Symbol's offers.

At the same time, plaintiffs allege that Brick and Haver had the opportunity, not only to control the accounting treatment accorded to Telxon's financial data, but to be aware of the substantial improprieties in that treatment. Thus, plaintiffs allege that Haver was the Chief Financial Officer with responsibility for preparing financial statements and SEC filings, and for interacting with Brick and Telxon's various financial advisors regarding the company's performance and the effect of that performance on the value of the company. Brick, in turn, was the President and Chief Operating Officer throughout the critical time period and was charged with oversight of all financial filings. Brick, moreover, acted as the Company's principal spokesperson on financial matters, publicly claiming to have substantial first-hand knowledge of these matters.

Defendants are correct that these types of "motive and opportunity" allegations, standing alone, are not sufficient to justify an inference of scienter. *See, e.g., In re Advanta Corp. Sec. Lit.,* 180 F.3d 525, 539 (3d Cir.1999) ("allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which we, on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.' "); *In Re Peritus,* 52 F.Supp.2d 211, 228 (D.Mass.1999) (generalized access or generalized knowledge not enough); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068–69 (5th Cir.1994) ("it does not follow that because executives have their compensation keyed to performance, one can infer fraudulent intent"). *Cf. Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994) (finding that assertions that defendant's officers and directors engaged in fraud to (1) increase their incentive based compensation, (2) protect and enhance their positions within the Company, and (3) enhance the value of the their stockholdings, were rejected because accepting those as sufficient would "effectively eliminate the state of mind requirement as to all corporate officers and defendants."); *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1130 (2d Cir.1994)

("plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold"). *But see Gross v. Medaphis*, 977 F.Supp. 1463 (N.D.Ga.1997) (motive of inflating stock to support "growth by acquisition" scheme was enough to establish scienter). The Court may, however, consider all of these allegations together, along with the financial statements, to assess the big picture involved. *See In re Digi Inc., Sec. Litig.*, 6 F.Supp.2d 1089 (D.Minn.1998) (considering allegations of motive and opportunity together with substantial restatements of financial disclosures to find scienter).

Thus, while the Court agrees that the allegations of motive and opportunity in plaintiffs' complaint would not be enough, even together, to properly plead scienter, the Court cannot ignore the fact that Telxon and its officers were in a very difficult position, facing unusual pressures to perform during the class period, and stood to benefit substantially from a performance record which matched the healthy ones Brick continually projected to the public. The Court finds these allegations to be "relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred," *Comshare*, 183 F.3d at 550, when considered in tandem with the substantial restatements of Telxon's financial disclosures, and the alleged accounting manipulations that caused those substantial restatements discussed below.

## C. GAAP Violations and Financial Restatements

Plaintiffs point to numerous and ongoing violations of GAAP, and to the massive restatements that Telxon made in late 1998 and early 1999, as further support for a "strong inference" of scienter. The Court does find these allegations, when

coupled with the motive and opportunity allegations referenced above, to be sufficient to state a claim under the PSLRA. *See In re Comshare*, 183 F.3d at 553. (stating that alleging "specific facts that illustrate "red flags" that should have put Defendants on notice of the revenue recognition errors, or that demonstrate reasons for Defendants to have questioned the revenue reporting" can be enough to support a strong inference of recklessness); *In re Health Management Sec. Litig.*, 970 F.Supp. 192, 203 (E.D.N.Y.1997) (finding strong inference of recklessness where defendant allegedly failed to follow proper audit procedures, GAAP violations led to material misstatements, and defendant ignored numerous "red flags").

The Court again agrees with defendants that GAAP violations are not generally enough, without more, to create a strong inference of reckless conduct. *See, e.g., In re Comshare*, 183 F.3d at 553.("the failure to follow GAAP is, by itself, insufficient to state a securities fraud claim"); *In Re Reliance Securities Litigation*, 91 F.Supp.2d 706, 726 (D.Del. 2000) ("General allegations that a defendant violated GAAP ... are inadequate to support a claim under Rule 10b–5"). Nor does the fact that GAAP violations continued over a long period of time necessarily alter that conclusion. *See In re Comshare*, 183 F.3d at 553. ("Although Plaintiffs speculate that it is likely that Defendant knew of the GAAP violations because they occurred over a long period of time, claims of securities fraud cannot rest 'on speculation and conclusory allegations.' ").[2] And, Telxon's admission to material misrepresentations in earlier accounts by way of its restatements is not alone enough to allege scienter. *See In re Comshare*, 183 F.3d at 553. ("Plaintiffs' claim that a subsequent

---

2. One of the reasons this is true is that GAAP is not "a canonical set of rules that will ensure identical accounting treatment of identical transactions," instead they "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Commissioner of Inter-*

*nal Revenue*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979); *Chalverus v. Pegasystems*, 59 F.Supp.2d 226 (D.Mass.1999). Thus, one person's accounting decisions on a given matter, even if open to debate, are not necessarily improper, much less intentionally misleading.

revelation of the falsehood of previous statements implies scienter lacks merit, since 'mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.'"); *In Re Digi,* 6 F.Supp.2d 1089 (D.Minn.1998)(same); *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1255–57 (N.D.Ill.1997)(same).

■■■■■ "To adequately allege scienter, in addition to bare allegations of GAAP violations, the complaint must show that defendants recklessly disregarded the deviance or acted with gross indifference toward the purported material misrepresentations contained in the financial statements." *Rehm,* 954 F.Supp. at 1255 (N.D.Ill.1997).

While it is true that the mere fact that a company's financial reporting was inaccurate does not establish scienter, *see Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1021 (5th Cir.1996); *In re General Electric Securities Lit.,* 1995 WL 590639 at *4 (S.D.N.Y. Oct.4, 1995), *affd. Chill v. General Electric Co.,* 101 F.3d 263 (2d Cir.1996), the magnitude of the reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors. *In re Leslie Fay Companies, Inc. Securities Lit.,* 835 F.Supp. 167, 175 (S.D.N.Y.1993) (rejecting independent auditor's motion to dismiss where allegations of large accounting errors gave rise to inference of scienter). The more serious the error, the less believable are defendants protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy.

*Rehm,* 954 F.Supp. 1246, 1256. *See also Gross v. Medaphis,* 977 F.Supp. 1463 (N.D.Ga.1997) (finding massive difference between original financial disclosures, and disclosures as restated leading to a strong inference of scienter); *Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226 (D.Mass 1999) ("Courts have held that significant overstatements of revenue 'tend to support

the conclusion that the defendants acted with scienter.'"); *Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1313 (C.D.Cal.1996) (although violations of GAAP generally are not sufficient standing alone to establish scienter, "when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter."). Thus, allegations of obvious "red flags," or warning signs that financial reports are misstated, can, where the misstatements are of a substantial magnitude, give rise to a strong inference of fraudulent intent. *In re Health Management,* 970 F.Supp. at 203 (finding that allegations of accounting firm's ignorance of red flags presented evidence of fraudulent intent); *Miller v. Material Sciences Corp.,* 9 F.Supp.2d 925, 928 (N.D.Ill. 1998) (deliberately ignoring obvious financial errors... "can constitute the sort of recklessness necessary to support § 10(b) liability").

■■■■■ Plaintiffs allege over three years of pervasive and escalating accounting manipulations. Plaintiffs allege that defendants (1) improperly recognized revenue, (2) understated its charges, (2) improperly valued accounts receivable, (3) improperly recorded charges, and (4) understated its bad debt expenses. While some of these alleged accounting manipulations, by themselves, would appear to be entirely discretionary, such as in which quarter bad debt should be recognized, others nearly create a strong inference of, at least, recklessness even when considered in isolation. Thus, there appears to be little or no justification for: (1) recognizing $14.1 million in revenue in one quarter for goods shipped to MDL, who had the right to return unsold products to Telxon, or to collect from Telxon if one of its customers did not pay for the product; (2) recognizing $6.9 million in revenues for product sold to a customer for which Telxon had guaranteed lease payments to a third party lessor; (3) increasing sales to Value Added Distributors who could return any item that was not sold, without

increasing its reserves for potential sales returns; or, (4) recognizing $1.9 million in revenue for goods that were shipped to another company location, rather than to a customer.[3] These accounting decisions are not of the type that are generally within any range of "reasonable treatments"; they are, instead, the kind of accounting entries which, at least on their face, would seem to put reasonable men, particularly those with the training, background and access to information available to Brick and Haver, on notice that they were improper and would lead to a serious misstatement of revenue.[4] This is particularly true, moreover, when one considers the number of accounting errors, the many quarters over which they occurred, and the fortuity of their timing—i.e., resulting in revenue increases at times when Telxon foretold that it would return to profitability, or when Telxon needed to show profits to justify rejecting Symbol's offer and to win its proxy battle with Wyser–Pratte.

Thus, the nature and number of the alleged accounting manipulations, coupled with the magnitude of the difference between the originally reported financial disclosures and their restatements, and the fact that the misstatements escalated dramatically in the face of the Symbol offer and proxy battle lead to the conclusion that defendants deliberately ignored numerous warning signs that should have alerted them to Telxon's misstatements. And that conclusion, in conjunction with the remaining allegations in the complaint, convince this Court that the plaintiffs have alleged scienter sufficiently.

The facts alleged here are far more egregious than those alleged in *In re Comshare*, 183 F.3d 542 (6th Cir.1999). Comshare, Inc. delayed releasing its fourth quarter and final year 1996 financial results because it discovered that its UK subsidiary was prematurely recognizing revenue on several sales that were not final. Comshare found that its UK subsidiary had prematurely recognized approximately $4 million in such revenues. Despite its recognition of this accounting error, Comshare still announced a total revenue of $26.6 million, a 9.8% increase over the prior fiscal year. This fairly discrete violation of GAAP, which, in turn, had a fairly minor impact on the accuracy of Comshare's statement of revenues, is a far cry the circumstances alleged here. Telxon, allegedly, overstated its revenues *for years,* did so by over $20 million in a *single* quarter and reported *profits* when it should have been reporting *losses* over *several different* quarters. The cases simply are not comparable.

**D. Statutory Safe Harbor for forward looking statements.**

 Defendants next argue that the Court should not consider certain of plaintiffs allegations in assessing whether they justify a strong inference of scienter because those allegations are based on "forward-looking statements" which are not actionable under the PSLRA. A "forward-looking statement" includes (a) statements containing projections of revenues, income, earnings per share, or other financial items, (b) statements of the plans and

---

3. The Court declines to impose a standard, espoused in Telxon's reply brief, which would require a detailed expert analysis of each GAAP violation alleged as a pleading prerequisite under the PSLRA. While defendants are correct that general claims of accounting errors are inadequate under either the PSLRA or 9(b), that is not what plaintiffs have done here. Plaintiffs have pointed to very specific transactions and accounting entries which they assert received improper treatment; nothing in the PSLRA implies that an expert analysis supporting those allegations must be incorporated into plaintiffs' complaint.

4. Particularly troubling is the fact that Telxon stated in press releases issued *shortly* before the restatements that it had provided adequately for inventory obsolescence, and that sales of its new pen-based product were proceeding well, while in its decision to restate only a few weeks later, and covering the same period of time (thus negating any inference that something had changed in the last few weeks), it announced that the Company had *not* adequately allowed for inventory obsolescence, and was experiencing numerous problems with its new pen-based products line.

objectives of management for future operations, and (c) statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). The statutory safe harbor insulates a defendant from private securities liability for forward-looking statements if the forward-looking statement is identified as such and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). Even if the forward-looking statements are not accompanied by meaningful cautionary statements, defendants are insulated from liability if the plaintiff cannot show that the forward-looking statements were made by or with the approval of an executive officer of the company who had "actual knowledge" that they were false or misleading. 15 U.S.C. § 78u-5(c)(1)(B).

 As plaintiffs point out, for the most part they are not alleging that defendants made fraudulently optimistic forward-looking statements, plaintiffs allege that defendants made historical, material misrepresentations of Telxon's financial health at the time, or shortly before those statements. "The statutory safe harbor, ... does not insulate defendants from private securities liability based on statements that misrepresent historical/hard current facts." *Gross v. Medaphis,* 977 F.Supp. 1463 (N.D.Ga.1997); *In re Sunbeam Securities Litigation,* 89 F.Supp.2d 1326, 1339 (S.D.Fl.1999). Further, the clear language of the PSLRA expressly excludes from the safe harbor statements that are "included in a financial statement prepared in accordance with generally accepted accounting principles." 15 U.S.C. § 78u5(b)(2)(A).

Though, surely, some of the sentences or words in each of the press releases and public statements might qualify under the

statutory safe harbor, or could not be found fraudulent at all because they are mere puffing or general expressions of optimism, the bulk of the statements upon which plaintiffs rely are far more concrete—either constituting Telxon's own statement of its current financial status, or constituting statements regarding past decisions and past performance which plaintiffs allege were simply untrue when made. In such circumstances, the existence of a safe harbor in the PSLRA does not alter the Court's inquiry into the adequacy of the complaint.[5]

**E. Rule 20(a)**

Plaintiffs also assert that Brick and Haver are vicariously liable under § 20(a) of the Exchange Act. § 20(a) imposes joint and several liability on any "person who, directly or indirectly, controls any person liable" for securities fraud under the Act, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violations. 15 U.S.C. § 78t(a).

 To establish liability under § 20(a), plaintiffs must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *See Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998). "Plaintiffs must show that defendants generally exercised control over the accused operations, but need not demonstrate that defendants actually exercised their authority to control the specific transaction or activity that is alleged to give rise to liability." *In Re Reliance Securities Litigation,* 91 F.Supp.2d 706 (D.Del.2000)(*citing Donohoe v. Consolidated Operating & Production Corp.,* 30 F.3d 907, 911–12 (7th Cir. 1994)).

---

**5.** It is clear, moreover, that many of the otherwise "forward-looking" statements referenced in the complaint are offered to show motive—*i.e.,* to explain defendants' alleged need to manipulate revenue in order to live up to their own promises. Thus, while those statements may not be independently actionable, they remain relevant to the question of scienter.

 Plaintiffs have alleged substantial circumstantial evidence to show that the financial disclosure statements issued by the Company contained material misstatements or omissions and that those material misstatements were made with scienter. "To the extent that a plaintiff sets forth a primary violation of the Exchange Act, dismissal of § 20(a) claim for derivative liability is inappropriate." *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 236 (D.Mass.1999). *See In re Fidelity/Micron Sec. Litig.*, 964 F.Supp. 539, 549 (D.Mass.1997). A motion to dismiss a § 20(a) claim should be denied, moreover, when the defendants themselves made the allegedly false and misleading statements. *See Chalverus*, 59 F.Supp.2d at 226 (holding that because defendants made the statements in the press release and signed the SEC disclosure forms, in light of a preliminary finding of a primary violation, it could not dismiss the § 20(a) action); *In re PLC Sys. Sec. Litig.*, 41 F.Supp.2d 106, 122 (D.Mass.1999) (same). It is a factual question as to whether the defendants exercised control over person committing violations of the securities laws; plaintiffs have alleged adequate evidence of fraud to allow discovery to proceed in this area.

As the Court has found that plaintiffs have sufficiently stated an underlying § 10(b) violation, the Court, therefore, finds that a § 20(a) violation has also sufficiently been alleged.

6. Other courts, in interpreting the same law, have reached similar conclusions about the particularity with which facts need to be alleged under the PSLRA. *See In re Reliance Sec. Litig.*, 91 F.Supp.2d 706, 725 (D.Del. 2000) ("Because the court is satisfied that plaintiffs have averred substantial circumstantial evidence of recklessness, the court will not require plaintiffs to specify, at this stage in the litigation, the involvement of each defendant in the alleged fraud."); *First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118 at *7, n. 3 (N.D.Ill. Nov. 4, 1998) ("the fact that Plaintiffs do not have all of the specific documents to support their claims at this time is not fatal to their complaint."); *See also Press v. Chemical Investment Serv.*

## IV. CONCLUSION

The Court agrees that the PSLRA intended to make it more difficult for would-be plaintiffs to pursue securities fraud claims. And, the Court is mindful that, in passing the PSLRA, Congress intended to protect businesses and those who operate them from attacks premised on their innocent, and even negligent, mistakes in judgment. Congress did not intend, however, to make it impossible to pursue such claims, or to protect reckless or fraudulent business choices. Thus, at the pleading stage, plaintiffs must justify their pursuit of claims under the securities laws, not prove them.[6] In this case, plaintiffs have done just that by setting forth a series of facts and well-supported beliefs from which a strong inference of reckless conduct on the part of defendants arises.

Accordingly, because the Court finds that plaintiffs have adequately alleged both a § 10(b) and § 20(a) violation under the Exchange Act, defendants' Motion to Dismiss is, hereby, **DENIED**.

**IT IS SO ORDERED.**

*Corp.*, 166 F.3d 529, 538 (2d Cir.1999) ("To impose a stricter standard at the pleading stage 'would make virtually impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did not involve specifically greedy comments from an authorized corporate individual.'"). *But see Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 283 (D.Mass.1998) (finding that plaintiff's failure to produce to the Court, at the motion to dismiss stage, "any particular document drafted by, or available to defendant that would indicate the defendant's knowledge of the company's problems" caused the complaint to fail).