*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0284p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WYSER-PRATTE MANAGEMENT CO., INC.,
  *Plaintiff-Appellant,*

*v.*

No. 04-3240

TELXON CORPORATION, et al.,
  *Defendants,*

PRICEWATERHOUSECOOPERS, LLP,
  *Defendant-Appellee.*

>

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-01105—Kathleen McDonald O'Malley, District Judge.

Argued: April 26, 2005

Decided and Filed: June 28, 2005

Before: GUY, BATCHELDER, and GIBSON, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** John C. Kairis, GRANT & EISENHOFER, Wilmington, Delaware, for Appellant. Geoffrey F. Aronow, HELLER, EHRMAN, WHITE & McAULIFFE, Washington, D.C., for Appellee. **ON BRIEF:** John C. Kairis, GRANT & EISENHOFER, Wilmington, Delaware, Brian E. Dickerson, Keith W. Schneider, MAGUIRE & SCHNEIDER, Columbus, Ohio, for Appellant. Geoffrey F. Aronow, HELLER, EHRMAN, WHITE & McAULIFFE, Washington, D.C., Pete C. Elliott, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, Cleveland, Ohio, Jeffrey L. Handwerker, ARNOLD & PORTER, Washington, D.C., for Appellee.

---

## OPINION

---

RALPH B. GUY, JR., Circuit Judge. Plaintiff, Wyser-Pratte Management Co., Inc. (WPMC), appeals from the district court's decision to dismiss, on statute of limitations grounds, the common law fraud claims it asserted against PricewaterhouseCoopers, LLP (PwC). WPMC's

---

[*]The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

complaint, filed on June 11, 2002, alleged that PwC, as well as Telxon Corporation and four of its former officers (Telxon defendants), engaged in a deceptive scheme to falsely inflate Telxon's financial results from at least March 31, 1996, through December 11, 1998. WPMC, an investment management firm that purchased and held Telxon stock, brought five counts of federal securities fraud against the Telxon defendants, as well as four counts of state law fraud and negligent misrepresentation against PwC.

WPMC and the Telxon defendants have settled, and WPMC has expressly abandoned its negligent misrepresentation claims. As such, WPMC's appeal is limited to the portion of the district court's June 4, 2003 Order dismissing the state law fraud claims as barred by the applicable two-year statute of limitations. WPMC argues that it was error for the district court to find, as a matter of law, that WPMC "knew, or had reason to know, of the facts by reason of which the actions of [PwC] were unlawful" no later than February 23, 1999. OHIO REV. CODE § 1707.43(B). WPMC further contends that the district court erred in finding that the limitations period was not tolled by the shareholder class action lawsuits commenced against Telxon on December 11, 1998, and against PwC on May 3, 2001. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983). After review of the record, the arguments presented on appeal, and the applicable law, we **AFFIRM** the district court's dismissal of WPMC's fraud claims.

## I.

### A.    Introduction

PwC, or its predecessor Coopers & Lybrand, LLP, served as Telxon's outside auditors from October 1990 until the relationship was terminated in July 1999. Telxon designs, manufactures, and distributes transaction-based wireless and mobile information systems (including, for example, retail bar-code scanners). Although Telxon became a wholly owned subsidiary of Symbol Technologies (Symbol) in November 2000, Telxon was an independent company whose stock was traded on the NASDAQ exchange at all times relevant to WPMC's fraud claims.

WPMC alleges that the Telxon defendants acted with PwC to falsely inflate Telxon's financial results in the audited financial statements for fiscal year (FY) 1996, FY 1997, and FY 1998, as well as the unaudited statements for the first two quarters of FY 1999 (ending June 30 and September 30, 1998). The individual defendants were officers during the alleged fraud. Frank Brick was promoted to president of Telxon in June 1996, and then served as chairman and CEO from February 1997 until his termination in March 1999. Kenneth Haver was Telxon's CFO and senior vice-president of finance and administration from March 1995 until his termination in March 1999. WPMC named two other former officers as defendants: James Cleveland, who was president from February 1997 through January 2000; and Gary Grant, who served as controller from 1997 through September 2001.[1]

During Brick's tenure, Telxon reported improved financial results and purported to "meet or beat" expectations for eleven consecutive quarters. In April 1998, Symbol Technologies made its first offer to buy out Telxon stock at a premium—offering $38 per share at a time when the stock was trading at $24.75. Brick touted Telxon's improved financial condition and its ability to generate consistent and predictable growth in the future. In May 1998, Telxon rejected Symbol's offer as too low. On June 2, 1998, Symbol offered $40 per share, or $42 per share in cash and stock. Telxon rejected the offer the same day, and WPMC began buying Telxon stock.

---

[1]Telxon, Brick, and Haver were named as defendants in the Telxon shareholder class action, but Cleveland and Grant were not.

WPMC alleges that its decision to invest in Telxon was based on Brick's public statements about Telxon's financial results, the audited financial statements for FY 1996 and FY 1997, and PwC's certifications that the statements were prepared in compliance with Generally Accepted Auditing Principles (GAAP) and that its audits were conducted in accordance with Generally Accepted Auditing Standards (GAAS). WPMC even inputed the data from the FY 1996 and FY 1997 statements into a computer modeling program and analyzed the results before deciding to accumulate Telxon stock.

Between June 2 and June 11, 1998, WPMC purchased 730,000 shares of Telxon stock, representing 4.9% of the outstanding shares, and launched a proxy fight to force a change in the board of directors. The proxy fight resulted in litigation, which was settled in August 1998. Telxon agreed that it would not invoke a "poison pill" if it received a fully financed cash offer for more than a specified premium. As a result of the settlement, WPMC's candidate joined the board of directors in November 1998. By December 11, 1998, WPMC had purchased nearly 900,000 shares of Telxon stock for more than $28 million.[2]

In November 1998, Telxon advised Symbol that it would accept $40.25 per share if the deal were closed quickly and without an examination of the books. As was reported in the *Wall Street Journal* on December 24, 1998, Symbol insisted on looking at the books "and what they found not only helped derail a $900 million takeover, but also was followed within a single week by a restatement of Telxon's earnings for the quarter ending September 30."

Symbol advised Telxon that its due diligence uncovered $14 million in improperly recognized revenue at the close of the second quarter (2Q) of FY 1999 (ending September 30, 1998), for purported sale of equipment to one of its value added retailers when there was no end buyer and the sale was indirectly guaranteed by Telxon. This, WPMC claims, was a clear violation of GAAP and accounted for a 47% jump in profits before nonrecurring items for 2Q FY 1999. Without this treatment, Telxon revenue would have been flat and Telxon would have shown a quarterly loss.[3]

## B.     Restatements

On December 11, 1998, Telxon announced that it would have to restate its financial results for 2Q FY 1999, "to reflect a change in the timing of recognizing revenues financed under a new floor-plan arrangement, to a segment of its Value-Add Distributor (VAD) channel." Telxon also indicated that it expected to report a *net loss* for that quarter of $.05 per share instead of the previously announced *net earnings* of $.22 per share. That same day, Telxon stock fell from $27.25 to close at $15 per share and the first shareholder class action suits were filed against Telxon, Brick, and Haver.

In late January 1999, Telxon announced a further delay in the restatement of its earnings for 2Q FY 1999. The *Wall Street Journal* reported that Telxon's management and the board's audit committee were working with PwC to review "certain judgmental accounting matters"; that Telxon was undertaking a "number of operating review initiatives to address the decline in operating results"; and that Telxon expected to incur a loss for *all* of FY 1999. On February 22, 1999, the *Wall Street Journal* reported that the SEC had begun a formal investigation of Telxon's auditing practices and of possible insider trading. Telxon's Form 10-Q, filed on February 16, 1999, disclosed the investigation and that Telxon was voluntarily cooperating with the SEC.

---

[2]WPMC alleges that its candidate for the board, Professor Macey, was not an employee of WPMC or its affiliates, but was simply a like-minded advocate of shareholder rights and an expert on corporate governance.

[3]Symbol finally acquired Telxon in November 2000 through a stock swap that valued Telxon at $23.47 per share.

In a second restatement on February 23, 1999, Telxon announced that the review of "certain judgmental accounting matters" had been completed by PwC, Telxon's management, and the board's audit committee. The press release stated, in part, that:

> Based on that review, with the concurrence of PwC, Telxon will restate its audited financial statements for fiscal years 1996, 1997 and 1998, and its unaudited interim financial statements for the first and second quarters of fiscal 1999. The restatement of the prior audited periods results from the re-evaluation of the accounting treatment of certain discrete transactions, not from the discovery of any irregularities or wrongdoing of the company. The majority of the aggregate restatement is attributable to asset impairments and valuation allowances, with the balance mostly attributable to adjustments of revenue previously recognized for certain transactions.

Telxon also reported that revenues for 2Q FY 1999 were affected by the loss of a $13 million order, delays in the roll-out of two large retail products, and lower than expected demand. While indicating that amended Forms 10-K and 10-Q would follow "as expeditiously as practicable over the coming weeks," Telxon also provided a breakdown of the impact of the restatements on the financial statements for FY 1996, FY 1997, FY 1998, and the first two quarters of FY 1999. In all, the announced restatements essentially wiped out $16.7 million, or $1.01 per share, in net income. On this news, the stock price fell another 16%, to close under $7 per share.

On March 10, 1999, Telxon announced that its CFO, Kenneth Haver, was "no longer with the company" and that a new financial advisor had been hired. Telxon also filed a Form 10Q/A with the SEC that provided some detail concerning items that were being restated for the three- and six-month periods ending September 30, 1998 (1Q and 2Q FY 1999), and for the three- and nine-month periods ending December 31, 1997 (first three quarters of FY 1998). Telxon disclosed that it had reversed recognition of $14.1 million in product revenue and $6.8 million associated with product financing during 2Q FY 1999 because the "criteria for revenue recognition had not been fully satisfied."[4]

This March 1999 announcement revealed other restated items as well, including: that Telxon increased its product sales return reserves by $4,725,000 for the six months ending September 30, 1998, "to better reflect the levels of product returns in the Company's value-added distribution channel"; that Telxon increased its provision for bad debt on past due accounts receivable relating to a single foreign retailer (Unimicro) by $3.2 million for the six months ending September 30, 1998, and by another $3.3 million for the nine months ending December 31, 1997; and that Telxon deferred $2 million in software license revenue it had recognized in 2Q FY 1999 because "certain contingencies related to the customer's acceptance of such software had not been satisfied." Telxon also disclosed that it had reversed $500,000 in software license revenues and royalties for the nine months ending December 31, 1997, and would defer recognition of such revenue "until those transactions [were] settled in cash." In addition, Telxon adjusted a $900,000 gain on the sale of a subsidiary from the quarter ending March 31, 1998, to the quarter ending June 30, 1998, because the conditions of the sale had not been satisfied before March 31; corrected treatment of $600,000 in severance payments related to its international operations that were improperly accrued as restructuring charges during the quarter ending December 31, 1996; and recognized a $1.4 million "asset impairment of the company's equity investment in the referenced foreign distributor." One week later, on March 17, 1999, Telxon fired CEO Frank Brick.

---

[4]WPMC alleges that it later learned those transactions with retailers MRK and Hechingers were booked in the last days of the quarter and involved shipment of inventory for which Telxon retained substantially all risks of ownership.

Telxon reported in a 10-Q filed with the SEC on June 16, 1999, that it would have to further restate its results for 2Q FY 1999 to reflect a reduction in revenue resulting from a change in the treatment of a transaction from a sale to an operating lease, "due to the company's guarantee of customer payments to the third-party lessor." This item was expected to increase the net loss for 2Q FY 1999 from $.25 per share to .$34 per share. Telxon also announced a delay in the release of its financial results for the fourth quarter of FY 1999 (ending March 21, 1999). One month later, on July 17, 1999, Telxon dismissed PwC as its outside auditor.

On August 10, 1999, Telxon announced that it had recorded a net loss of $137 million, or $8.50 per share (diluted), for FY 1999, as compared to net income of $8.2 million, or $.50 per share (diluted) for FY 1998. Telxon also made its third and final restatement of financial results, which incorporated the items previously disclosed and included some additional restated items. With the additional items, the restatements taken together wiped out about $18 million in net earnings (an increase over the $16.2 million announced on February 23, 1999).

Details of the newly restated items were also disclosed at that time. For FY 1998, Telxon's new restatements included: $2.9 million in additional adjustments for bad debts owed by Unimicro; reversal of $1.6 million in software license revenues and $764,000 in related royalty costs; $4.6 million in impairment charges for uncollected notes receivable; $750,000 in the amount of gain relating to the sale of an investment; and an increase of $721,000 in inventory obsolescence reserves. For FY 1997, WPMC points to additional reversals of $1.25 million in software license revenues and $1.2 million in related royalty costs; a recharacterization of $1.44 million in product sales as a lease with revenues defined on a straight-line basis; increased amortization charges of $932,000 for notes receivable related to a divestiture of retail software assets; the expensing of $759,000 previously capitalized as product purchase advances; a $1.2 million increase in obsolescence reserves; and an increase of $450,000 in severance charges previously recorded as restructuring charges. Finally, adjustments to earnings for FY 1996 included the reversal of $2 million in revenue; $490,000 in increased inventory obsolescence reserves; and $342,000 in increased sales returns and allowance reserves.

## C.     Related Class Actions

WPMC did not file its complaint until June 11, 2002, but relies on earlier filed class actions to argue both that the limitations period did not begin to run until May 2001, and that the limitations period on its fraud claims was suspended by the filing of one or both of the class action lawsuits. All three actions, which were assigned to the same district judge, alleged the same scheme to falsely inflate Telxon's financial results.

### 1.     Telxon Class Action

As mentioned earlier, the first shareholder class action suits were brought against Telxon, Brick, and Haver on December 11, 1998. The district court consolidated those suits with another 25 shareholder suits filed against these defendants in the days and weeks that followed. *In re Telxon Corp. Sec. Litig.*, 67 F. Supp.2d 803 (N.D. Ohio 1999). On September 30, 1999, lead plaintiffs, William and Arthur Hayman, filed an amended consolidated class action complaint asserting federal securities fraud claims against Telxon, Brick, and Haver on behalf of all investors who purchased Telxon securities between May 21, 1996, and February 23, 1999.

The Telxon defendants promptly filed a motion to dismiss, which triggered an automatic stay of discovery under the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-

4(b)(3)(B).[5]  Lead plaintiffs moved to lift the stay to allow it to conduct discovery against PwC, arguing that the one-year limitations period applicable to federal securities claims might expire before they could determine whether they could allege facts sufficient to satisfy the PSLRA's heightened requirements for pleading scienter.  Finding it would contravene the purposes of the PSLRA to lift the stay and allow pre-litigation discovery as to a nonparty, the district court denied the motion in February 2000.

Telxon's motion to dismiss was denied on September 29, 2000.  *In re Telxon Corp. Sec. Litig.*, 133 F. Supp.2d 1010 (N.D. Ohio 2000).   After outlining in detail the alleged misrepresentations and accounting manipulations, the district court concluded that the lead plaintiffs had alleged facts sufficient to give rise to a strong inference of scienter.  With this decision, the stay was lifted and lead plaintiffs commenced discovery against PwC.

On May 1, 2001, with leave from the court, Telxon filed a third-party complaint against PwC seeking contribution and asserting state law claims for malpractice, fraud, misrepresentation, breach of contract, and breach of fiduciary duty.  Telxon alleged that PwC was aware of and had access to all information about the restated items, participated in the preparation of the financial statements, and certified compliance with GAAP and GAAS.  Telxon also claimed that PwC understaffed the account with inexperienced auditors and coerced Telxon into restating its earnings to cover its own actions.  In this case, WPMC contends that no reasonable investor could have known of the facts underlying PwC's alleged fraud until after Telxon filed its third-party complaint on May 1, 2001.

Lead plaintiffs' motion for certification of a class asserting claims against Telxon was granted on September 19, 2001, but no class claims were asserted against PwC.

### 2.      PwC Class Action

On May 3, 2001, William and Arthur Hayman filed a separate class action against PwC on behalf of investors who purchased Telxon securities between May 3, 1998, and February 23, 1999, asserting federal securities fraud claims arising from PwC's participation in the scheme to falsely inflate Telxon's financial results.  PwC responded with a motion to dismiss, arguing, *inter alia*, that the claims were barred by the applicable one-year statute of limitations and that the plaintiffs had failed to allege facts sufficient to establish a strong inference that PwC acted with the required scienter.

On March 25, 2002, the district court denied the motion in all relevant respects and dismissed only those claims arising from the unaudited statements for FY 1999.  The district court found that although the class plaintiffs had notice of the "possibility of fraud" by PwC no later than February 23, 1999, there was a question of fact whether plaintiffs had exercised due diligence in attempting to discover the scope of PwC's fraud that precluded dismissal of the federal securities fraud claims on statute of limitations grounds.  While that decision is not before us on appeal, WPMC maintains that it was inconsistent with the district court's later conclusion that WPMC's fraud claims were barred as a matter of law by Ohio's two-year statute of limitations.  Those arguments will be addressed below.

Class certification was granted in the PwC class action on August 26, 2002, but not before WPMC commenced its own action.

---

[5]That section provides, in part, that:  "In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."  *Id.*

**D.          WPMC's Lawsuit**

When WPMC sued PwC and the Telxon defendants on June 11, 2002, discovery was already underway in the class action suits. At the request of defense counsel, the district court consolidated WPMC's suit with the class actions for purposes of discovery. The defendants filed motions to dismiss WPMC's claims on a variety of grounds, which were granted in part and denied in part for the reasons set forth in the district court's order of June 4, 2003. In that decision, the district court found the Telxon class action tolled the limitations period for some but not all claims against Telxon, Brick, and Haver; ruled that other claims were barred by a release granted in connection with the proxy fight; and certified questions to the Ohio Supreme Court to determine whether Ohio would recognize a claim, either in fraud or misrepresentation, for having caused an investor to *hold* a security. With entry of final judgment, the certified questions were declared moot.

As noted earlier, this appeal is limited to the portion of the order dismissing the fraud claims against PwC as barred by the applicable two-year statute of limitations. In that regard, the district court found that the limitations period began to run no later than February 23, 1999; that, as a result, the limitations period expired before the PwC class action was filed on May 3, 2001; and that the Telxon class action did not toll the limitations period for claims asserted against PwC because no class claims were alleged against PwC.

**II.**

We review the district court's dismissal of the fraud claims *de novo*. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 547 (6th Cir. 1999). On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), we must construe the complaint in the light most favorable to WPMC, accept the factual allegations as true, and determine whether WPMC can prove any set of facts that would entitle it to relief. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001). In addition to the allegations in the complaint, the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice. *Id.* at 360-61; *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1183 (2004).

WPMC insists that it was error for the district court to dismiss its fraud claims against PwC in the face of its averments concerning the statute of limitations. WPMC specifically alleged that a reasonably diligent investor could not have known of PwC's participation in the fraud until after Telxon filed its third-party complaint against PwC on May 1, 2001. WPMC also alleges that the limitations period was suspended, or "tolled," by the filing of the class action suits. These, however, are legal conclusions that the district court is not required to accept as true. *Bovee*, 272 F.3d at 361 (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).[6]

**A.          Statute of Limitations**

Ohio law is clear that because WPMC's fraud claims arise out of or are predicated on the sale of securities, they are governed by the specific statute of limitations set forth in Ohio Rev. Code § 1707.43(B); not the four-year general statute of limitations for fraud claims found in Ohio Rev. Code § 2305.09. *Lynch v. Dean Witter Reynolds, Inc.*, 731 N.E.2d 1205 (Ohio App. 1999); *Kondrat v. Morris*, 692 N.E.2d 246 (Ohio App. 1997); *Hater v. Gradison Div. of McDonald & Co. Sec., Inc.*,

---

[6]WPMC relies on the proposition that dismissal of a complaint as time barred is improper if the complaint alleges facts that might toll the statute of limitations. It is clear from the cases relied on, however, that they stand for the unremarkable proposition that a plaintiff's factual allegations must be accepted as true. *See Austin v. Brammer*, 555 F.2d 142, 144 (6th Cir. 1977) (alleged fact of imprisonment that would toll limitations period); *Helman v. EPL Prolong, Inc.*, 743 N.E.2d 484 (Ohio App. 2000) (facts that might support equitable tolling of the limitations period).

655 N.E.2d 189 (Ohio App. 1995); *see also Goldberg v. Cohen*, No. 01-CA-49, 2002 WL 1371031 (Ohio App. June 13, 2002) (unpublished decision) (discussing cases). At the time of the district court's decision, Ohio Rev. Code § 1707.43(B) provided that no action may be brought

> more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than four years from the date of such sale or contract for sale, which ever is the shorter period.

While constructive notice is therefore sufficient to start the two-year period, the Ohio courts have not discussed what is required to establish constructive notice under this provision. *Gounaris v. Apple*, No. 11556, 1990 WL 26091 (Ohio App. Mar. 6, 1990) (unpublished decision) (actual or constructive notice).[7]

The district court held that notice of "the possibility of fraud by PwC" was sufficient to trigger the limitations period under Ohio Rev. Code § 1707.43(B), and that WPMC was "clearly on notice of the possibility of fraud by PwC" no later than February 23, 1999. Incorporating the earlier finding from the PwC class action, the district court reasoned that:

> While the mere restatement of financial results is not sufficient, by itself, to state a claim for securities fraud, the Court finds that the pervasive nature of these restatements—involving the restatement of three consecutive years of audited financial statements—is sufficient to lead a reasonable person to investigate whether he or she might have a claim for fraud against PwC, especially given the accounting irregularities giving rise to the restatements.

In finding that notice of "the possibility of fraud" was sufficient to start the limitations period, the district court concluded that the Ohio statute encompassed only the first prong of the two-pronged analysis it had applied to the federal securities fraud claims in the PwC class action.

WPMC contends this was error and argues that the Ohio courts would apply the same standard for state law securities fraud claims as has been adopted for federal securities fraud claims. In support of this position, WPMC argues that this would be consistent with the interpretation adopted by the Ohio court for determining when a plaintiff has constructive notice of a general fraud claim under Ohio Rev. Code § 2305.09 (cause does not accrue "until the fraud is discovered"). *See Investors REIT One v. Jacobs*, 546 N.E.2d 206 (Ohio 1989) (syllabus 2(b)) ("have discovered, or should have discovered").

WPMC is correct that constructive notice under § 2305.09 has been interpreted to require both "notice of the possibility of wrongdoing" and a "reasonable opportunity to inquire" to start the limitations period running.[8] As PwC points out, the legislature chose to "carve out" a different and

---

[7]This section was amended effective September 16, 2003, after the district court's order dismissing the claims against PwC but before entry of final judgment, to extend the period of "repose" from four years to five years. OHIO REV. CODE § 1707.43(B) (as amended). Because the statute provides that the limitations period is the *shorter* of the two, the district court did not address this statute of repose and we need not either.

[8]"No more than a reasonable opportunity to discover the [fraud] is required to start the period of limitations. Information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire with due diligence." *Craggett v. Adell Ins. Agency*, 635 N.E.2d 1326, 1333 (Ohio App. 1993); *see also Copeland v. Delvaux*, 623 N.E.2d 569, 572 (Ohio App. 1993). "Once a party has information sufficient to give rise to a duty to inquire, no more than a reasonable opportunity to inquire is required to start the running of the period of limitation." *Nemeth v. Aced, Hobbs, Wassell and O'Connor*, No. 95APE06-768, 1996 WL 76319, at *5 (Ohio App. Feb. 22, 1996) (unpublished decision).

shorter limitations period for all claims arising out of the sale of securities. While it is not clear how the Ohio courts may choose to interpret § 1707.43(B), we assume for purposes of this appeal that it will be interpreted to require more than simply notice of "the possibility of fraud" to start the limitations period running. Moreover, we assume because Ohio has adopted a limitations period specific to claims arising out of the sale of securities, that the Ohio courts would apply a standard consistent with the "inquiry notice" standard applicable to similar federal securities fraud claims. *See* 15 U.S.C. § 78i(e) (action must be brought "within one year after the discovery of the facts constituting the violation"); 15 U.S.C. § 77m ("one year after the discovery" or "after such discovery should have been made by the exercise of reasonable diligence"). Giving WPMC the benefit of this assumption, we consider *de novo* when the limitations period began to run on its claims against PwC.

### 1.      Inquiry Notice

After the district court's decision in this case, we clarified the standard for "inquiry notice" in *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003), *cert. denied*, 540 U.S. 1183 (2004). Joining at least seven other circuits, this court held that "inquiry notice" is sufficient to trigger the limitations period for securities fraud claims brought under § 10(b). The court also rejected the view that the limitations period should begin to run when a plaintiff learns facts that would cause a reasonable investor to investigate the "possibility of fraud." Instead, adopting the majority view, the court held that "knowledge of suspicious facts—'storm warnings,' they are frequently called—merely triggers a duty to investigate, and that the limitation period begins to run only when a reasonably diligent investigation would have discovered the fraud." 336 F.3d at 501. In other words, the limitations period "begins to run when a plaintiff should have discovered, by exercising reasonable diligence, the facts underlying the alleged fraud." *Id.* This, the court found, reflected an "appropriate balance" between the competing interests in requiring plaintiffs to bring suit promptly while "'not driving plaintiffs to bring suit . . . before they are able, in the exercise of reasonable diligence, to discover the facts necessary to support their claims.'" *Id.* (citation omitted).[9]

As WPMC emphasizes, the failure to follow GAAP, or the fact of a restatement, does not by itself establish fraud on the part of an outside auditor. *Comshare*, 183 F.3d at 553. The recklessness required to find securities fraud on the part of an independent auditor must "'approximate[] an actual intent to aid in the fraud being perpetrated by the audited company.'" *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (citation omitted). "[W]hen the alleged accounting errors are sufficiently basic and large, their existence, in combination with other factors, may support the requisite scienter inference." *Id.* at 694 (citing *In re Telxon*, 133 F. Supp.2d at 1031) (denying motion to dismiss the Telxon class action).[10]

In rejecting WPMC's position that it should be treated the same as the plaintiffs in the PwC class action, the district court relied in part on a distinction between the pleading requirements for the state law claims under Fed. R. Civ. P. 9(b) and the requirements imposed by the PSLRA for

---

[9]The district court defined "inquiry notice" to include two prongs: (1) an objective inquiry into whether the plaintiff knew or should have known of the possibility of fraud (the "storm warnings"); and (2) a *subjective* determination of whether the plaintiff exercised due diligence in attempting to determine the scope and cause of the fraud. The district court did not have the benefit of the decision in *New England*, which frames the "second prong" as an objective inquiry into when a reasonably diligent investigation would have discovered the facts underlying the alleged fraud.

[10]To establish scienter, more than a misapplication of accounting principles is required, and the plaintiff must show that "'the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.'" 364 F.3d at 693-94 (citation omitted).

federal securities fraud claims. Although WPMC takes issue with this distinction, this court recognized in *PR Diamonds* that there is a difference when it comes to pleading scienter. Rule 9 provides that a defendant's state of mind "may be averred generally," while the PSLRA adopted a heightened standard for pleading scienter in federal securities fraud cases. *PR Diamonds*, 364 F.3d at 682. This is relevant to the question of when WPMC should have discovered facts sufficient to allege its state law fraud claims against PwC.

### 2.    Analysis

We find that "storm warnings" were certainly present by February 23, 1999, as the restatements announced at that time wiped out $16.7 million in earnings, based on the "review of certain judgmental accounting matters," the bulk of which were attributed to recognition of asset impairments, adjustments to valuation allowances, and correction of improperly recognized revenue. Other storm warnings preceded that announcement, however, including: the collapse of the Symbol deal following a due diligence review of Telxon's books; the December 11, 1998 restatement of earnings; the shareholder class actions filed that day alleging misrepresentations in the financial statements; delays in the release of financial results because the review of certain judgmental accounting matters had not been completed; and the SEC's commencement of a formal investigation covering Telxon's accounting practices.

WPMC argues that it could not have known from the restatements announced on February 23, 1999, of facts supporting a claim that PwC participated in the scheme to falsely inflate Telxon's financial results. First, WPMC claims that at that point Telxon was apparently still content with PwC's services since the restatements were made "with the concurrence of PwC." On the contrary, PwC's "concurrence" in no way negates PwC's alleged participation in the fraudulent scheme. In fact, WPMC alleges that the Telxon defendants and PwC acted together to falsely inflate the company's financial results. PwC's concurrence in the restatements indicated its agreement that the financial statements over a three-and-a-half year period had materially misrepresented the company's financial condition.

WPMC also relies on the fact that the February 1999 restatements did not include all of the transactions that were ultimately restated in August 1999. While that is true, the question is when the plaintiff should have discovered the facts underlying PwC's participation in the fraud. The newly disclosed items were of the same nature as those that had been previously disclosed and told nothing new about PwC's involvement in the scheme. With the additional items, the restatements for the entire period wiped out about $18 million in net earnings (as opposed to the $16.2 million announced on February 23, 1999).

With the March 10, 1999 disclosures, Telxon revealed some detail concerning the restatements that suggested the nature of the accounting manipulations and that they were not "small mistakes" that could have been overlooked. Without repeating all the items, we note that they included the outright reversal of more than $20 million in product revenues and financing because the "criteria for revenue recognition had not been recognized"; an increase in product return reserves by $4.725 million for a six-month period; and a $6.5 million adjustment to receivables to account for bad debts owed by a single retailer. A week later, Telxon also fired Brick and Haver. These disclosures added to the texture of the information available to WPMC in evaluating the earlier storm warnings, the February restatements, and the facts underlying PwC's alleged participation in the fraud.

Finally, WPMC urges us to find that it could not have known the facts underlying its claims against PwC until May 2001, when Telxon filed its third-party complaint and the class plaintiffs filed their own action against PwC. The crux of this argument is that WPMC could not successfully establish scienter without direct evidence from a participant in the fraud or access to PwC's internal

work papers. First, we agree with the district court that WPMC was not required to plead scienter with the level of specificity required by the PSLRA. Second, even if it were, we find that WPMC may not delay the commencement of the statute of limitations until after it has secured direct evidence of PwC's culpability. This court rejected a similar argument in *New England*, which was also a securities fraud claim brought against an outside auditor.

New England filed an earlier action against the company, Fruit of the Loom, alleging the same accounting manipulations that formed the basis of the claims against the auditor. New England argued that it could not have known whether the accountant's certification of the financial statements were knowingly or recklessly false until after the accountant's workpapers were obtained in the earlier action. Rejecting this argument, the court explained that:

> We agree that scienter on the part of corporate insiders—which New England plainly alleged in the Fruit complaint—does not necessarily imply scienter on the part of outside auditors. At the same time, however, direct evidence of scienter is not necessary to a determination of fraud. *See*, *e.g.*, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 [] (1983) (noting that scienter may be proved with circumstantial evidence). In this case, we believe, the facts alleged in the Fruit complaint strongly suggest that Fruit's auditors were at least reckless.

> For one thing, the alleged fraud relates primarily to departures from GAAP contained in audited financial statements—the "same issues," New England has said, that are addressed in the Ernst complaint—and not to representations that were neither scrutinized nor approved by the auditors. Moreover, the scope of the alleged fraud—involving overvaluation of fixed assets and inventory by more than $400 million, premature recognition of more than $50 million in sales, and failure to accrue liabilities and charges totaling $89 million—is such that any reasonable investor would question the auditors' oversight. As New England says in its brief, the fraud "does not involve little mistakes that the auditors might have overlooked." In the light of the particular allegations against Fruit, we are at a loss to understand why New England should not have determined, by July 1, 1998, that Ernst knowingly or recklessly participated in the alleged fraud.

*New England*, 336 F.3d at 502.

Seeking to distinguish *New England*, WPMC argues that it was New England that filed the earlier action against the company as well as the later action against the auditor. The relevance of the prior action was not that New England had filed it, but was that the facts alleged in the earlier complaint provided inquiry notice sufficient to start the limitations period on claims that the auditors participated in the fraud. Likewise, we may consider the facts that were known or should have been known to WPMC at the time the original class action suits were filed against Telxon. This case is more like *New England* than it is different.

In denying the motion to dismiss the class claims against the Telxon defendants, the district court provided this characterization of the accounting manipulations at issue:

> Plaintiffs allege over three years of pervasive and escalating accounting manipulations. Plaintiffs allege that defendants (1) improperly recognized revenue, (2) understated its charges, [3] improperly valued accounts receivable, [4] improperly recorded charges, and [5] understated its bad debt expenses. While some of these alleged accounting manipulations, by themselves, would appear to be entirely discretionary, such as in which quarter bad debt should be recognized, others nearly create a strong inference of, at least, recklessness even when considered in

isolation. . . . These accounting decisions are not of the type that are generally within any range of "reasonable treatments"; they are, instead, the kind of accounting entries which, at least on their face, would seem to put reasonable men, particularly those with the training, background and access to information available to Brick and Haver, on notice that they were improper and would lead to a serious misstatement of revenue. This is particularly true, moreover, when one considers the number of accounting errors, the many quarters over which they occurred, and the fortuity of their timing—*i.e.*, resulting in revenue increases at times when Telxon foretold that it would return to profitability, or when Telxon needed to show profits to justify rejecting Symbol's offer and to win its proxy battle with Wyser-Pratte.

*In re Telxon*, 133 F. Supp.2d at 1030. As in *New England*, the alleged fraud by PwC is based on the same accounting manipulations and misleading financial statements as the fraud claims against the Telxon defendants and are such that any reasonable investor would question the oversight of the auditor. In its reply brief, WPMC points to the following allegations as having been first disclosed by the May 2001 complaints against PwC:

PwC violated GAAS by failing to adequately plan and supervise the work of its staff or establish and carry out procedures reasonably designed to search for and detect the existence of material misstatements, and by substituting client representations for audit procedures;

PwC recklessly assigned new and inexperienced auditors to the Telxon account, limited the time and experience devoted to the Telxon account in order to increase PwC's profit margin, and completely ignored serious concerns raised by Telxon as early as April 1997 as to the service being provided by PwC;

PwC consciously and recklessly disregarded the risk that Telxon's financial statements might contain material errors, particularly relating to certain transactions occurring at the end of the second quarter of 1999, by failing to test and evaluate Telxon's internal control structure in order to verify that Telxon had appropriate policies, practices and personnel in place to ensure that non-standard, unusual and significant transactions were properly account[ed] for;

PwC coerced Telxon to restate its financial statements in order to conceal PwC's own reckless audits and reviews of the financial reporting periods in question; and

PwC concealed that it was insisting on Telxon's restatements in order to obviate the appearance of fraud by PwC and limit PwC's exposure to liability.

Telxon also alleged that PwC's audit plans identified certain audit risks, but recklessly disregarded them in conducting the audits and certifying the financial statements.

Comparison of the allegations of fraud against Telxon and PwC show that the "facts" WPMC contends were first disclosed in the allegations made against PwC in the May 2001 complaints do not reveal that anything materially different was discovered about PwC's participation in the fraud. The essence of WPMC's argument is, as it was in *New England*, that it was entitled to discover direct evidence of PwC's recklessness before the statute of limitations began to run.

Given the less stringent pleading requirements for scienter applicable to WPMC's state law fraud claims, we find that WPMC knew or should have known in the exercise of reasonable diligence of the facts underlying the claim that PwC participated in the alleged fraud no later than the end of March 1999. Thus, WPMC's complaint filed on June 11, 2002, was not filed within two

years of commencement of the statute of limitations and, in the absence of class action tolling, is time barred.

## B.     Class Action Tolling

The Supreme Court has held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (footnote omitted).  The Court later clarified that tolling applied not only to intervenors, but also to putative class members who file actions of their own. *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983) (*Crown*).  The district court concluded, and the parties agree, that because WPMC's claims are based on Ohio law, Ohio's tolling principles govern. *See*, *e.g.*, *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 265 (7th Cir. 1998).  The Ohio Supreme Court has adopted class action tolling, in reliance on the reasoning of *American Pipe* and *Crown*, holding that "the filing of a class action, whether in Ohio or the federal court system, tolls the statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Vaccariello v. Smith & Nephew Richards, Inc.*, 763 N.E.2d 160, 163 (2002).  Given the reliance on the Supreme Court's decisions and the dearth of Ohio court decisions, the district court and the parties looked to federal class action principles for guidance in applying class action tolling.

### 1.     Telxon Class Action

The first principle of significance to this case is that the class action must afford the defendant with adequate notice.  In *American Pipe*, the Court explained that

> policies of ensuring essential fairness to defendants and of barring a plaintiff who "has slept on his rights" . . . are satisfied when, as here, a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment.

414 U.S. at 554-55.  A caution was noted by Justice Powell that "[w]hen thus notified, the defendant normally is not prejudiced by tolling of the statute of limitations.  It is important to make certain, however, that *American Pipe* is not abused by the assertion of claims that differ from those raised in the original class suit." *Crown*, 462 U.S. at 355 (Powell, concurring). *See also Vaccariello*, 763 N.E.2d at 162 (tolling consistent with purposes of putting defendants on notice of adverse claims and preventing plaintiffs from sleeping on their rights).

Consistent with this principle, the district court rejected WPMC's claim that the filing of the class action against Telxon, Brick, and Haver served to suspend the limitations period with respect to WPMC's claims of fraud against PwC.  The few cases that have considered similar situations have held that class action tolling does not apply to a defendant not named in the class action complaint. *See*, *e.g.*, *Arneil v. Ramsey*, 550 F.2d 774, 782 n.10 (2d Cir. 1977) (nothing in *American Pipe* supports tolling of the period as to a person not named as a defendant in the class action); *Preito v. John Hancock Mut. Life Ins. Co.*, 132 F. Supp.2d 506, 518-19 (N.D. Tex. 2001) *aff'd on other grounds*, No. 01-10161, 2002 WL 760853 (5th Cir. April 17, 2002).  In fact, this court has held, albeit in an unpublished decision without much discussion, that *American Pipe* tolling did not apply to claims against a defendant that was not named in a prior class action. *Highland Park Ass'n of Businesses and Enters. v. Abramson*, No. 94-6424, 1996 WL 382252 (6th Cir. July 3, 1996) (unpublished decision); *accord Beavercreek Local Schs. v. Basic, Inc.*, 595 N.E.2d 360, 373 (Ohio App. 1991) ("statute of limitations continues to run as to a potential defendant who is not named as

a defendant in the class suit because a nondefendant lacks notice of the assertion of claims against him").

On appeal, WPMC argues that the Telxon class action should serve to suspend the limitations period against PwC because the class plaintiffs *could have* asserted claims against PwC in the first case and sought to lift the stay of discovery in order to obtain discovery from PwC. As such, WPMC argues, PwC had adequate notice because it knew or should have known it was *subject to* suit for claims arising out of the same operative facts as the class claims asserted against Telxon. In support, WPMC relies on the following statement from this court's decision in *Weston v. AmeriBank*, 265 F.3d 366, 368 (6th Cir. 2001): "Under *American Pipe*, the statute of limitations for putative class members of the original class is tolled only for substantive claims that were raised, or could have been raised, in the initial complaint." In *Weston*, however, tolling was not sought as to a defendant who was not named in the class action, but, rather, to federal claims that were not and could not have been brought in the class action. This court explained:

> The Dressels' initial complaint alleged solely state law violations. The state circuit court denied the Dressels' request to amend their complaint to assert a TILA claim because the applicable statute of limitations had run when the Dressels filed their initial complaint. Thus, the state law claims raised in *Dressel* are separate and distinct from Weston's TILA claims. The *Dressel* case did not toll the TILA's one-year statute of limitations for Weston's TILA claim because the Dressels did not assert a TILA claim and the Dressels could not have made a TILA claim in their initial complaint because their complaint was filed after the TILA's one-year statute of limitations had run.

*Id.* at 368-69. We find *Weston* inapplicable to this situation and agree with the district court that because PwC was not a defendant in the Telxon class action, WPMC may not rely on class action tolling to suspend the statute of limitations on WPMC's claims against PwC.

### 2.          PwC Class Action

In contrast, PwC was a defendant in the PwC class action suit filed on May 3, 2001. Because we have concluded that the statute of limitations began to run on WPMC's claims against PwC before May 3, 1999, the applicable two-year statute of limitations expired before this class action was filed. For this reason, we conclude, as did the district court, that WPMC cannot rely on tolling from this second class action to rescue its claims against PwC from the statute of limitations bar.

Even if we were to find that the statute of limitations did not begin to run on WPMC's state law fraud claims until Telxon fired PwC in July 1999, or the final restatements were announced in August 1999, PwC argues that we should find WPMC "forfeited" the benefit of class action tolling by filing suit before decision on the motion for class certification. PwC raised this argument in its motion to dismiss, but the district court did not reach it.

While our research reveals no circuit court decisions addressing this "forfeiture" argument, a number of district courts have held that a plaintiff who chooses to file an independent action without waiting for a determination on the class certification issue may not rely on the *American Pipe* tolling doctrine. The reasoning rests in part on the holding in *Crown* that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." 462 U.S. at 354. The purposes of *American Pipe* tolling are not furthered when plaintiffs file independent actions before decision on the issue of class certification, but are when plaintiffs delay until the certification issue has been decided. One district court explained:

> Many good purposes are served by such forbearance, as *American Pipe* and *Crown, Cork* themselves spell out. The parties and courts will not be burdened by separate lawsuits which, in any event, may evaporate once a class has been certified. At the point in a litigation when a decision on class certification is made, investors usually are in a far better position to evaluate whether they wish to proceed with their own lawsuit, or to join a class, if one has been certified.

*In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp.2d 431, 452 (S.D. N.Y. 2003) (citing cases), *reconsid. denied*, 380 F. Supp.2d 214, 230 (S.D. N.Y. 2004). As is exemplified by *In re Worldcom*, this limitation on class action tolling has taken hold in a number of district courts, with no courts rejecting it, and is not a new proposition. *See*, *e.g.*, *In re Ciprofloxacin Hydrocloride Antitrust Litig.*, 261 F. Supp.2d 188, 221 (E.D. N.Y. 2003); *Rahr v. Grant Thornton LLP*, 142 F. Supp.2d 793, 800 (N.D. Tex. 2000); *Stutz v. Minn. Mining & Mfg. Co.*, 947 F. Supp. 399, 404 (S.D. Ind. 1996); *Wachovia Bank & Trust Co. v. Nat'l Student Mktg. Corp.*, 461 F. Supp. 999, 1012 (D. D.C. 1978). The reasoning supporting this approach is both sound and persuasive. Even if the limitations period did not commence until July or August 1999, we find in the alternative that WPMC may not rely on the PwC class action to suspend the limitations period on its fraud claims against PwC.

**AFFIRMED.**